## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, N.W.
Washington, DC 20580

                 Plaintiff,

           v.

**RAG-STIFTUNG**
Im Welterbe 10
Essen, Germany 45141

**EVONIK INDUSTRIES AG**
Rellingshauser Strabe 1-11
Essen, Germany 45128

**EVONIK CORPORATION**
299 Jefferson Road
Parsippany, NJ 07054

**EVONIK INTERNATIONAL HOLDING B.V.**
Hettenheuvelweg 37/37
1101BM Amsterdam, Netherlands

**ONE EQUITY PARTNERS SECONDARY FUND, L.P.** and
**ONE EQUITY PARTNERS V, L.P.**
510 Madison Ave, 19th Floor
New York, NY 10022

**LEXINGTON CAPITAL PARTNERS VII (AIV I), L.P.**
660 Madison Avenue, 23rd Floor
New York, NY 10065

Case: 1:19-cv-02337
Assigned To : Kelly, Timothy J.
Assign. Date : 8/2/2019
Description: TRO/Prelim. Injunct. (D-DECK)

**RECEIVED**

AUG 0 2 2019

Clerk, U.S. District and
Bankruptcy Courts

**PEROXYCHEM HOLDING COMPANY LLC**
**PEROXYCHEM HOLDINGS, L.P.**
**PEROXYCHEM HOLDINGS LLC** and
**PEROXYCHEM LLC**
2005 Market Street #3200
Philadelphia, PA 19103

And

**PEROXYCHEM COOPERATIEF U.A.**
Herengracht 466
1017 CA Amsterdam, Netherlands

Defendants.

### COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), by its designated attorneys, petitions this Court to enter a stipulated temporary restraining order and grant a preliminary injunction enjoining Defendants RAG-Stiftung, Evonik Industries AG, Evonik Corporation, and Evonik International Holding B.V., (collectively, "Evonik"), One Equity Partners Secondary Fund, L.P. and One Equity Partners V, L.P., (collectively, "One Equity Partners"), Lexington Capital Partners VII (AIV I), L.P., and PeroxyChem Holding Company LLC, PeroxyChem Holdings, L.P., PeroxyChem Holdings LLC, PeroxyChem LLC, and PeroxyChem Cooperatief U.A., (collectively, "PeroxyChem"), including their agents, divisions, parents, subsidiaries, affiliates, partnerships, or joint ventures, from consummating their proposed acquisition (the "Acquisition"). Plaintiff seeks this provisional relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b). Absent such provisional relief, Evonik and PeroxyChem (collectively, "Defendants") would be free to consummate the Acquisition after 11:59 p.m. EDT on August 7, 2019.

2

Plaintiff requires the aid of this Court to maintain the status quo and prevent interim harm to competition during the pendency of an administrative proceeding on the merits. The Commission has already initiated that administrative proceeding pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45, by filing an administrative complaint on August 2, 2019. Pursuant to FTC regulations, the administrative hearing on the merits will begin five months from the date of that filing (*i.e.*, on January 2, 2020). That administrative hearing will determine the legality of the Acquisition and will provide all parties a full opportunity to conduct discovery and present testimony and other evidence regarding the likely competitive effects of the Acquisition.

## NATURE OF THE CASE

1.      This is an action to temporarily restrain and preliminarily enjoin the consummation of an anticompetitive Acquisition of PeroxyChem by Evonik, two of only five hydrogen peroxide producers in North America. Hydrogen peroxide is a commodity chemical used for oxidation, sterilization, and bleaching, and for most end uses, there are no effective substitutes. Hydrogen peroxide producers sell to customers in various industries, including pulp and paper, food packaging, agriculture, chemical synthesis, mining and gas, and personal care. The pulp and paper industry uses most of the hydrogen peroxide produced in North America, primarily for bleaching pulp and deinking recycled paper. This case does not concern electronics-grade hydrogen peroxide, which requires additional manufacturing steps and is not a substitute for other forms of hydrogen peroxide.

2.      Defendants compete vigorously for customers, especially in regional markets in the Pacific Northwest and the Southern and Central United States. In the Pacific Northwest, the Acquisition would combine two of only three significant hydrogen peroxide producers in the

region. In the Southern and Central United States, the Acquisition would combine the two largest hydrogen peroxide producers by nameplate production capacity, and two of the three largest hydrogen peroxide suppliers by sales. The Acquisition would create a firm with a dominant share and significantly increase market concentration in each regional market.

3.       Post-Acquisition, Evonik would control more than half of the market, based on capacity and sales, for the production and sale of hydrogen peroxide in the Pacific Northwest, where Solvay would be the only other hydrogen peroxide producer with a meaningful presence. In the Southern and Central United States, post-Acquisition, Evonik would control nearly half of the market, based on capacity and sales, for the production and sale of hydrogen peroxide, with only Solvay, Arkema, and Nouryon remaining.

4.       Under the 2010 U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger Guidelines"), a post-acquisition market-concentration level above 2,500 points, as measured by the Herfindahl-Hirschman Index ("HHI"), and an increase in market concentration of more than 200 points renders an acquisition presumptively unlawful. Based on both capacity and sales, in both the Pacific Northwest and the Southern and Central United States, the Acquisition would significantly increase concentration in already concentrated markets, well beyond the thresholds set forth in the Merger Guidelines. Thus, under the Merger Guidelines, the Acquisition is presumptively unlawful in both the Pacific Northwest and the Southern and Central United States.

5.       The Acquisition would substantially lessen competition for the production and sale of hydrogen peroxide in at least two ways. First, the Acquisition will increase the likelihood of coordination in a market already vulnerable to coordination, functioning as an oligopoly, and with a long history of price-fixing, including guilty pleas, litigation, and substantial fines and

settlements. The hydrogen peroxide industry is already characterized by significant market transparency, strong interdependence among a few major competitors, low demand elasticity, and high entry barriers. Several hydrogen peroxide suppliers previously admitted to illegally fixing prices at a time when there were six major suppliers in North America. After the Acquisition, there will be only two suppliers remaining in the Pacific Northwest and four suppliers remaining in the Southern and Central United States. In each of the two relevant geographic markets, the Acquisition removes one of only a few competitors, thereby strengthening and reinforcing the existing oligopolistic market dynamics and making coordination amongst the few remaining suppliers easier. The Acquisition will thus increase the likelihood of coordinated effects in both the Pacific Northwest and the Southern and Central United States.

6.      Second, the Acquisition would eliminate significant head-to-head competition between Evonik and PeroxyChem in the Pacific Northwest and the Southern and Central United States. In both regional markets, customers benefit from head-to-head competition amongst a small handful of hydrogen peroxide suppliers, including the merging parties. The Acquisition would substantially reduce that competition. Direct competition between Evonik and PeroxyChem has repeatedly resulted in lower prices for customers. If consummated, the Acquisition threatens significant harm to hydrogen peroxide customers in both the Pacific Northwest and the Southern and Central United States by eliminating direct competition.

7.      New entry or expansion by existing hydrogen peroxide producers would not be timely, likely, or sufficient to counteract the anticompetitive effects of the Acquisition. There are significant barriers to entry for potential producers of hydrogen peroxide. These include the need for substantial capital investment and the likelihood that it would take multiple years to build a

new hydrogen peroxide production plant. These barriers make entry or expansion difficult, and incapable of constraining the merged entity. Expansion or repositioning by the remaining firms sufficient to offset the Acquisition's anticompetitive effects is also unlikely. Nor are increases in hydrogen peroxide imports or repositioning by other chemical producers likely to offset the anticompetitive effects of the Acquisition.

8.      No cognizable, merger-specific efficiencies would offset the likely and substantial competitive harm resulting from the Acquisition.

9.      On August 2, 2019, by a 4-0 vote, the Commission found reason to believe that the Acquisition would substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45. On the same day, the Commission commenced an administrative proceeding on the antitrust merits of the Acquisition before an Administrative Law Judge, with the merits trial scheduled to begin on January 2, 2020. The ongoing administrative proceeding provides a forum for all parties to conduct discovery, followed by a merits trial with up to 210 hours of live testimony. *See* 16 C.F.R. § 3.41 (2014). The decision of the Administrative Law Judge is subject to appeal to the full Commission, which, in turn, is subject to judicial review by a United States Court of Appeals.

10.     The parties have stipulated to the Court's entry of a temporary restraining order preventing the parties from consummating the acquisition until the fifth business day after the court rules on the Commission's motion for a preliminary injunction or until after the date set by the District Court, whichever is later. Such a temporary restraining order is necessary to preserve the status quo and protect competition while the Court considers the Commission's application for a preliminary injunction.

11.     Preliminary injunctive relief is similarly necessary to preserve the status quo and

to protect competition during the Commission's ongoing administrative proceeding. Allowing

the Acquisition to proceed while the Commission is assessing whether the Acquisition's

potential anticompetitive effects would harm consumers would undermine the Commission's

ability to remedy the anticompetitive effects of the Acquisition if it is found unlawful after a full

trial on the merits and any subsequent appeals.

## JURISDICTION AND VENUE

12.     This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. §

53(b), and under 28 U.S.C. §§ 1331, 1337, and 1345. This is a civil action arising under the Acts

of Congress protecting trade and commerce against restraints and monopolies, and is brought by

an agency of the United States authorized by an Act of Congress to bring this action.

13.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part;

Whenever the Commission has reason to believe –

(1) that any person, partnership, or corporation is violating, or is about to violate, any
provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission
and until such complaint is dismissed by the Commission or set aside by the court
on review, or until the order   of the Commission made thereon has become final,
would be in the interest of the public – the Commission by any of its attorneys
designated by it for such purpose may bring suit in a district of the United States
to enjoin any such act or practice.  Upon a proper showing that weighing the
equites and considering the Commission's likelihood of ultimate success, such
action would be in the public interest, and after notice to the defendant, a
temporary restraining order or a preliminary injunction may be granted without
bond . . .

14.     Defendants are, and at all relevant times have been, engaged in activities in or

affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of

the Clayton Act, 15 U.S.C. § 12.

15.     Defendant PeroxyChem has expressly consented to personal jurisdiction in the District of Columbia. In addition, personal jurisdiction exists where service is effected pursuant to a federal statute. Fed. R. Civ. P. 4(k)(1)(C). The FTC Act, 15 U.S.C. § 53(b), authorizes nationwide service of process. Defendants are therefore subject to personal jurisdiction in the District of Columbia. Venue is proper in the District of Columbia under 28 U.S.C. § 1391(b) and (c), as well as under 15 U.S.C. § 53(b).

## THE PARTIES AND THE PROPOSED ACQUISITION

16.     Plaintiff, the Commission, is an administrative agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580. The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

17.     Defendant RAG-Stiftung owns Defendant Evonik Industries AG, a large chemicals manufacturer, headquartered in Essen, North Rhine-Westphalia, Germany. Defendant Evonik Corporation is a wholly owned subsidiary of Evonik Industries AG, and is based in New Jersey. Defendant Evonik International Holding B.V. is a wholly owned subsidiary of Evonik Industries AG, and is based in the Netherlands. In 2006, RAG-Stiftung acquired Degussa, a long-time hydrogen peroxide producer, and ultimately renamed the company Evonik. Evonik had worldwide revenue of €14.4 billion in 2017. Evonik has three North American hydrogen peroxide production plants located in Mobile, Alabama; Gibbons, Alberta; and Maitland, Ontario.

18.     Defendant One Equity Partners Secondary Fund, L.P. holds all of the limited partnership interests of Defendant One Equity Partners V, L.P. Defendant Lexington Capital

Partners VIII (AIV I), L.P. indirectly holds a majority of the limited partnership interests in One

Equity Partners Secondary Fund, L.P. One Equity Partners is the private investment arm of J.P.

Morgan Chase & Co., which owns Defendant PeroxyChem Holding Company LLC, a leading

global manufacturer of several chemicals, including hydrogen peroxide based in Philadelphia,

Pennsylvania. PeroxyChem Holding Company LLC owns Defendant PeroxyChem Holdings

LLC, Defendant PeroxyChem Holdings, L.P., Defendant PeroxyChem LLC, and Defendant

PeroxyChem Cooperatief. One Equity Partners acquired FMC Global Peroxygens, a long-time

hydrogen peroxide producer, in 2014, renaming the business PeroxyChem. PeroxyChem has two

hydrogen peroxide production plants in North America, in Bayport, Texas and Prince George,

British Columbia. PeroxyChem also recently opened a plant in Saratoga Springs, New York.

That plant purifies hydrogen peroxide produced at PeroxyChem's Bayport facility to create

electronics-grade hydrogen peroxide.

19.     Pursuant to an Agreement and Plan of Merger dated November 7, 2018, Evonik

proposes to acquire 100% of the voting securities of PeroxyChem for approximately $625

million in cash.

20.     Pursuant to the Hart-Scott-Rodino Antitrust Improvements Act, 15 U.S.C. § 18a,

and a timing agreement between Defendants and Commission staff, unless temporarily restrained

and preliminarily enjoined by this Court, Defendants would be free to consummate the

Acquisition after 11:59 p.m. on August 7, 2019.

21.     In authorizing the filing of this complaint, the Commission has determined that

(1) it has reason to believe the Acquisition would violate the Clayton Act and the FTC Act by

substantially lessening competition in one or more lines of commerce, and (2) an injunction of

the Acquisition pending the resolution of the Commission's administrative proceedings and any

appeals will promote the public interest, so as to minimize the potential harm to customers and

preserve the Commission's ability to grant an adequate remedy if it concludes, after the

administrative proceeding, that the Acquisition is unlawful.

## RELEVANT MARKETS

22.     The production and sale of hydrogen peroxide to customers in (1) the Pacific

Northwest and (2) the Southern and Central United States constitute relevant antitrust markets.

### A. Relevant Product Market

23.     The relevant product market in which to assess the effects of the Acquisition is

hydrogen peroxide. Hydrogen peroxide is an oxidizing agent with diverse uses such as bleaching

pulp, chemical synthesis, and sterilizing food packaging. The primary use of hydrogen peroxide

produced in North America is for bleaching in the pulp and paper industry.

24.     The relevant product market at issue in this case does not include electronics-

grade hydrogen peroxide. Electronics-grade hydrogen peroxide is used by semiconductor

manufacturers as a cleaning and etching agent to remove contaminants from semiconductor

wafers that go into cell phones, computers, and other advanced electronic devices. Electronics-

grade hydrogen peroxide requires additional purification capabilities that vary by hydrogen

peroxide producer, and not all hydrogen peroxide producers are capable of producing

electronics-grade hydrogen peroxide. Hydrogen peroxide is not a substitute for electronics-grade

hydrogen peroxide.

25.     Hydrogen peroxide is a commodity chemical. The primary raw materials in

manufacturing hydrogen peroxide are natural gas and hydrogen. The hydrogen peroxide

production process in North America is comprised of three steps: 1) hydrogenation, 2) oxidation,

10

and 3) extraction. This process results in crude hydrogen peroxide, which is then diluted, filtered, and stabilized depending on customer end-use.

26.     There are no reasonably interchangeable substitutes for hydrogen peroxide, and customers could not realistically switch to other chemicals in the face of a small but significant non-transitory increase in price. For pulp and paper customers, who purchase the majority of hydrogen peroxide in North America, mills are set up to use specific chemicals in the bleaching process. These customers could not switch to a different bleaching chemical without purchasing new equipment and re-formulating the bleaching process, which would be costly and could take several years to implement. Similarly, there are no effective substitutes for hydrogen peroxide for other end-use applications.

**B. Relevant Geographic Markets**

27.     Defendants compete in regional markets for the production and sale of hydrogen peroxide to customers. Accordingly, it is appropriate to analyze the competitive effects of the Acquisition in certain regional markets in which Defendants compete. There is also likely to be harm to customers that are outside of these geographic markets.

28.     The relevant regional geographic markets in which to assess the Acquisition's effects are: (1) the Pacific Northwest and (2) the Southern and Central United States.

29.     Hydrogen peroxide is delivered to customers predominantly by rail or truck. There are high transportation costs associated with delivering hydrogen peroxide, particularly relative to the value of the product itself. As a result, hydrogen peroxide producers deliver from plants that are relatively nearer to customers because – when all else is equal – it is more cost-effective to deliver at shorter distances. While hydrogen peroxide producers use terminals to deliver further distances, this usage increases the cost of delivery.

30.     Defendants, like the other major North American hydrogen peroxide producers, analyze the industry by geographic regions, routinely treating the Pacific Northwest and the Southern and Central United States as separate regions.

31.     Evonik and PeroxyChem individually negotiate prices with customers and price differently based on customers' locations. When hydrogen peroxide producers negotiate with a multiregional customer, the customer's prices typically vary by region.

32.     Customers within one of the relevant regional geographic markets are unlikely to purchase hydrogen peroxide outside of that market and transport it themselves, given the cost of delivery and the importance of proximity. Further, customers could not defeat a price increase by purchasing indirectly from or through other customers (*i.e.*, arbitrage).

33.     Competitive conditions for the production and sale of hydrogen peroxide differ by region. Evonik and PeroxyChem each compete to serve customers in the Pacific Northwest and the Southern and Central United States, where clusters of hydrogen peroxide customers are located. Additionally, Evonik and PeroxyChem each have plants in the Pacific Northwest and the Southern and Central United States.

34.     The Pacific Northwest consists of approximately Washington, Oregon, Montana, Idaho, and Wyoming in the United States, along with British Columbia, Alberta, Manitoba, and Saskatchewan in Canada.

35.     The Southern and Central United States consists of approximately Alabama, Arkansas, Arizona, California, Colorado, the District of Columbia, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Missouri, Mississippi, North Carolina, North Dakota, Nebraska, New Mexico, Nevada, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, Wisconsin, and West Virginia.

12

## THE ACQUISITION'S PRESUMPTIVE ILLEGALITY

36.     Post-Acquisition, the combined entity would have a dominant share of sales to customers in both the Pacific Northwest and the Southern and Central United States, and the Acquisition would greatly increase concentration in these already concentrated markets.

37.     Other than Evonik and PeroxyChem, only one other hydrogen peroxide producer has significant sales in the Pacific Northwest: Solvay. Following the Acquisition, the merged entity will be the largest hydrogen peroxide producer in the Pacific Northwest, with more than half of the production capacity and sales in the region.

38.     In the Southern and Central United States, Evonik and PeroxyChem compete with Solvay, Arkema, and Nouryon. By nameplate production capacity, Evonik and PeroxyChem are the two largest hydrogen peroxide producers, and are two of the top three suppliers of hydrogen peroxide by sales. Following the Acquisition, the merged entity will be the largest hydrogen peroxide producer in the area, with nearly half of the production capacity and sales in the region.

39.     The Merger Guidelines and courts often measure concentration using HHIs. HHIs are calculated by totaling the squares of the market shares of every firm in the relevant market pre- and post-Acquisition. Under the Merger Guidelines, an acquisition is presumed likely to create or enhance market power – and is presumptively illegal – when the post-acquisition HHI exceeds 2,500 and the acquisition increases the HHI by more than 200 points.

40.     The market for hydrogen peroxide in each relevant regional market is already concentrated. Post-Acquisition, each regional market would be substantially more concentrated than it is today.

41.     In the Pacific Northwest, post-Acquisition Evonik would control more than half of the production capacity and sales in the relevant market. Post-Acquisition, the HHI in the

13

relevant market far exceeds the 2,500 points that demonstrate that a market is highly

concentrated. Moreover, the Acquisition would increase HHIs in an already highly concentrated

market by significantly more points than required for a presumption that the Acquisition is likely

to enhance market power.

42.     In the Southern and Central United States, post-Acquisition Evonik would control

nearly half of the production capacity and sales in the market. Post-Acquisition, the HHI in the

relevant market would exceed the 2,500 points that demonstrate that a market is highly

concentrated. Moreover, the Acquisition would increase HHIs in an already concentrated market

by significantly more points than required for a presumption that the Acquisition is likely to

enhance market power.

43.     Thus, in both relevant markets, the Acquisition would result in concentration well

above the amount necessary to establish a presumption of competitive harm.

44.     Therefore, the Acquisition is presumptively unlawful.

## ANTICOMPETITIVE EFFECTS

### A. The Acquisition Would Increase the Likelihood of Anticompetitive Coordination

45.     The markets for the production and sale of hydrogen peroxide to customers

already demonstrate numerous characteristics that make them vulnerable to coordinated conduct.

These characteristics include a commodity product; a highly concentrated market structure with a

limited number of competitors; significant transparency regarding the competitive and strategic

decisions of rival firms; customers with long-term, stable supplier relationships allowing for easy

detection of deviations from past practices; low elasticity of demand; and a history of strong

interdependent behavior.

46.     Given these characteristics, it is not surprising that the industry has a history of

price fixing, including guilty pleas, private litigation, and substantial fines and settlements.

14

Evonik's predecessor, Degussa, entered into an antitrust leniency agreement with the U.S.
Department of Justice for its cooperation with a criminal antitrust investigation into illegal price
fixing involving hydrogen peroxide. As part of the same criminal price-fixing case, Solvay and
AkzoNobel (now Nouryon) entered plea agreements which summarized the facts underlying the
anticompetitive behavior among the hydrogen peroxide producers:

> [Solvay] . . . participated in a conspiracy among major hydrogen peroxide producers, the
> primary purpose of which was to suppress and eliminate competition by fixing the price
> of hydrogen peroxide sold in the United States and elsewhere. In furtherance of the
> conspiracy, the defendant, through certain of its former officers, directors, and
> employees, engaged in discussions and attended meetings with representatives of other
> major hydrogen peroxide producers. During these discussions and meetings, agreements
> were reached to fix the price of hydrogen peroxide sold in the United States and
> elsewhere.

47.     The major North American hydrogen peroxide producers have considerable
visibility into their competitors' business. Competitors track a wealth of information about each
other—including plant-by-plant production capacities, production and inventory levels, costs,
and customer locations served—by monitoring public statements and gathering competitive
information from customers, distributors, and others throughout the industry.

48.     North American hydrogen peroxide producers also have significant awareness of
their competitors' pricing. The major costs to produce hydrogen peroxide are natural gas and
electricity, which allows hydrogen peroxide producers to estimate production costs at competitor
plants. Further, when responding to competitive bids, hydrogen peroxide producers factor in
transportation costs from their competitors' hydrogen peroxide production plants. Hydrogen
peroxide producers also learn about competitor pricing during the competitive bid process for
customers, whether formal or informal.

49.     Having competed against each other in an oligopolistic market environment for
many years, the major North American hydrogen peroxide producers recognize their mutual

15

interdependence and aligned incentives. For years, hydrogen peroxide producers have engaged in parallel pricing behavior and other types of parallel accommodating conduct, including refraining from competing aggressively to win new business for fear of provoking a competitive response from a rival. By eliminating a key competitor, the Acquisition may exacerbate the anticompetitive effects of this interdependence.

50.     Allowing Evonik to acquire PeroxyChem will increase the likelihood of anticompetitive coordination by eliminating a large, independent competitor. In the Pacific Northwest, the Acquisition creates a duopoly, leaving Evonik and Solvay as the only hydrogen peroxide producers remaining in the region. In the Southern and Central United States, the Acquisition establishes a firm controlling nearly half of the production capacity and sales in the region. Previous industry conduct demonstrates that hydrogen peroxide producers were successfully able to fix prices with six firms competing in North America. The Acquisition would reduce the number of remaining firms to two in the Pacific Northwest and four in the Southern and Central United States, making coordination among the remaining firms both easier and more likely to increase.

**B.  The Acquisition Would Eliminate Vital Head-to-Head Competition Between Evonik and PeroxyChem**

51.     The Acquisition would eliminate significant direct, head-to-head competition between Defendants. Customers benefit substantially from the competition between Evonik and PeroxyChem in the form of lower prices. The Acquisition would substantially reduce that competition.

52.     Evonik and PeroxyChem compete for customers in both the Pacific Northwest and the Southern and Central United States, to the direct benefit of customers. Evonik and PeroxyChem track rival firms' price movements and respond to competition by offering better

16

prices. This competition enables customers to pit hydrogen peroxide producers against each other in negotiations to obtain lower prices and increased discounts. Customers benefit from having more hydrogen peroxide producers in the region from which to obtain competitive pricing.

53.     Post-Acquisition, Evonik would face less meaningful competition in both regional markets than it does today. Evonik would not need to compete as aggressively on price to win or retain the business of many customers. Other hydrogen peroxide producers will be unable to make up for the competition lost as a result of the Acquisition.

54.     The only remaining hydrogen peroxide producer with a significant presence in the Pacific Northwest is Solvay. Customers in the Pacific Northwest are often unwilling to use hydrogen peroxide producers with plants outside the Pacific Northwest—Arkema and Nouryon—due to their distance from customer locations, which results in higher delivered prices and an increased risk of supply issues. Further, Arkema and Nouryon generally do not bid on customers' business in the Pacific Northwest.

55.     The only remaining hydrogen peroxide producers in the Southern and Central United States are Solvay, Arkema, and Nouryon. However, post-Acquisition, Evonik would control nearly half of the production capacity and sales in the region. Solvay, Arkema, and Nouryon do not have sufficient capacity to mitigate the anticompetitive effects of the Acquisition in the Southern and Central United States. Further, for certain customers, some of these suppliers are not viable options due to smaller production capacities.

## LACK OF COUNTERVAILING FACTORS

56.     Defendants cannot demonstrate that new entry or expansion by existing firms would be timely, likely, or sufficient to offset the anticompetitive effects of the Acquisition.

57.     The hydrogen peroxide market is characterized by substantial barriers to entry. Building a new hydrogen peroxide plant would take multiple years and a large capital investment. Thus, sufficiently timely entry is unlikely to occur in response to the Acquisition's anticompetitive effects in the Pacific Northwest or the Southern and Central United States to prevent significant anticompetitive harm.

58.     Expansion or repositioning by the remaining firms that would defeat anticompetitive effects in the hydrogen peroxide markets in the Pacific Northwest or the Southern and Central United States is also unlikely. While Solvay expanded production of hydrogen peroxide at its Longview, Washington plant in 2016, there has been no other substantial increase in hydrogen peroxide capacity in the last decade. Further, any expansion would require a large capital investment. Thus, expansion would not be timely, likely, or sufficient in the Pacific Northwest or the Southern and Central United States to counteract the anticompetitive effects of the Acquisition.

59.     Other industrial chemical producers are unlikely to reposition. The same barriers to entry and expansion by existing hydrogen peroxide producers hold true for industrial chemical manufacturers.

60.     There are no significant imports of hydrogen peroxide into North America, and North American hydrogen peroxide producers do not view imports as a competitive threat. Further, customers do not view imports as a viable option for hydrogen peroxide due to supply chain challenges and transportation costs.

61.     Defendants cannot demonstrate cognizable, merger-specific efficiencies that would be sufficient to rebut the strong presumption and evidence of the Acquisition's likely significant anticompetitive effects in the relevant markets.

## LIKELIHOOD OF SUCCESS ON THE MERITS,
## BALANCE OF EQUITIES, AND NEED FOR RELIEF

62.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed acquisition is unlawful, to seek preliminary injunctive relief to prevent consummation of the acquisition until the Commission has had an opportunity to adjudicate the acquisition's legality in an administrative proceeding. In deciding whether to grant relief, the Court must balance the likelihood of the Commission's ultimate success on the merits against the public equities. The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in effective enforcement of the antitrust laws. Private equities affecting only Defendants' interest cannot defeat a preliminary injunction.

63.     The Commission is likely to succeed in proving that the effect of the Acquisition may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, or Section 5 of the FTC Act, 15 U.S.C. § 45. In particular, the Commission is likely to succeed in demonstrating, among other things, that:

a.  The Acquisition is likely to have anticompetitive effects in the relevant regional geographic markets for the production and sale of hydrogen peroxide;

b.  Substantial and effective entry or expansion in these markets is difficult and would not be timely, likely, or sufficient to offset the anticompetitive effects of the Acquisition; and

c.  The efficiencies asserted by Defendants are insufficient as a matter of law to justify the Acquisition.

64.     Preliminary relief is warranted and necessary. Should the Commission rule, after the full administrative proceeding, that the Acquisition is unlawful, reestablishing the status quo

of vigorous competition between Evonik and PeroxyChem would be difficult, if not impossible, if the Acquisition has already occurred in the absence of preliminary relief. Moreover, in the absence of relief from this Court, irreversible harm to competition would likely occur in the interim, even if suitable divestiture remedies were obtained later.

65.   Accordingly, the equitable relief requested here is in the public interest. The Commission respectfully requests that the Court:

1.   Enter the parties' stipulated temporary restraining order and preliminarily enjoin Defendants from taking any further steps to consummate the Acquisition, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

2.   Retain jurisdiction and maintain the status quo until the administrative proceeding that the Commission has initiated is concluded; and

3.   Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated: August 2, 2019

Of counsel:

D. BRUCE HOFFMAN
(D.C. Bar 495385)
Director
Federal Trade Commission
Bureau of Competition

GAIL LEVINE
(D.C. Bar 454727)
Deputy Director
Federal Trade Commission
Bureau of Competition

CHARLES A. LOUGHLIN
(D.C. 448219)
Chief Trial Counsel
Federal Trade Commission
Bureau of Competition

DOMINIC VOTE
(D.C. Bar 985637)
Assistant Director
Federal Trade Commission
Bureau of Competition
Mergers II Division

AMY DOBRZYNSKI
MICHAEL BLEVINS
STEVEN A. DAHM
FRANCES ANNE JOHNSON
MICHAEL LOVINGER (D.C. Bar 990801)
DANIEL MATHESON (D.C. Bar 502490)
Z. LILY RUDY (D.C. Bar 1023073)
STEPHEN SANTULLI (D.C. Bar 1617916)
CECELIA WALDECK (D.C. Bar 443969)

Attorneys
Federal Trade Commission
Bureau of Competition
Mergers II Division

Respectfully Submitted,

JAMES RHILINGER
(D.C. Bar 472255
Deputy Assistant Director
Federal Trade Commission
Bureau of Competition
Mergers II Division
400 Seventh Street, S.W.
Washington, DC 20024
Telephone: (202) 326-2871
Facsimile:  (202) 326-2286
Email: jrhilinger@ftc.gov

*Attorney for Plaintiff Federal Trade Commission*

21

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 2nd day of August, 2019, I served the foregoing on the following counsel via electronic mail:

Eric Mahr
Freshfields Bruckhaus Deringer US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005-3960
Tel: (202) 777-4545
Email: eric.mahr@freshfields.com

*Counsel for Defendants RAG-Stiftung, Evonik Industries AG, Evonik Corporation, and Evonik International Holding B.V.*

Mike Cowie
James Fishkin
Dechert LLP
1900 K St, NW
Washington, DC 20006
Tel: (202) 261-3339
Email: mike.cowie@dechert.com

*Counsel for Defendants One Equity Partners Secondary Fund, L.P., One Equity Partners V, L.P., Lexington Capital Partners VII (AIV I), L.P., PeroxyChem Holding Company LLC, PeroxyChem Holdings, L.P., PeroxyChem Holdings LLC, PeroxyChem LLC, and PeroxyChem Cooperatief U.A.*

James Rhilinger
Attorney for Plaintiff Federal Trade Commission

22