**DX 308**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | CASE NO. SACV 10-1873 AG (MLGx) |
| Plaintiff, | ORDER DENYING PRELIMINARY INJUNCTION |
| v. | |
| LABORATORY CORPORATION OF AMERICA, et al., | **REDACTED** |
| Defendants. | |

Plaintiff Federal Trade Commission ("FTC") seeks a preliminary injunction against Defendants Laboratory Corporation of America and Laboratory Corporation of America Holdings ("Defendants" or, collectively, "LabCorp"). After holding a hearing and reviewing all papers and arguments submitted, the Court DENIES the preliminary injunction.

**EXHIBIT A**

2

Case 8:10-cv-01873-AG-MLG Document 457-1 Filed 03/25/19 Page 23 of 41 Page ID #:2181
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 3 of 41 Page ID #:2130
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 2 of 40 Page ID #:1978

**FINDINGS OF FACT**

After reviewing the evidence, the Court makes the following findings of fact, including any findings of fact found in the Conclusions of Law.

## 1. THE PARTIES AND THE TRANSACTION

1. The FTC seeks a preliminary injunction under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b) (2006), against the proposed acquisition of Westcliff Medical Laboratories ("Westcliff") by LabCorp. Preliminary injunctive relief is sometimes necessary to allow the FTC to determine, in administrative adjudication, whether the acquisition would violate Section 5 of the FTC Act, as amended, 15 U.S.C. § 45 (2006), or Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18 (2006), because it may substantially lessen competition.

2. Defendant LabCorp is a Delaware corporation with its office and principal place of business located at 358 South Main Street, Burlington, North Carolina. Def.'s Answer ¶ 13 (Dkt. No. 69); LapCorp, U.S. Securities and Exchange Commission Form 10-K 1 (2009), *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=84636&p=irol-SECText&TEXT=aHR0cDovL2lyLmludC53ZXN0bGF3YnVzaW5lc3MuY29tL2RvY3VtZW50L3YxLzAwMDA5MjAxNDgtMTAtMDAwMDIxL3htbA%3d%3d.

3. LabCorp is the second-largest independent clinical laboratory company in the United States. It provides clinical laboratory testing services to clients in all fifty states and the District of Columbia through a national network of primary, branch, and short turn around time ("STAT") laboratories, and over 1,500 patient service centers ("PSCs"). LabCorp, U.S. Securities and Exchange Commission Form 10-K 4 (2009), *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=84636&p=irol-SECText&TEXT=aHR0cDovL2lyLmludC53ZXN0ZXN0ZXN0

1    bGF3YnVzaW5lc3MuY29tL2RvY3ZtZW50L3yxLzAwMDA5MjAxNDgtMTAtMDAwMDIx

2    L3htbA%3d%3d.

3

4    4. Westcliff, immediately before its acquisition by LabCorp, was the third-largest independent

5    clinical laboratory in California. PX 0154 at ¶ 23 (Flyer Decl.); Pl.'s Presentation to the Court,

6    Prelim. Inj. Hr'g 21 (Feb. 3, 2011).

7

8    5. Westcliff was founded in 1964. Until June 2006, Westcliff operated as a clinical laboratory

9    services provider headquartered in and primarily focused on serving Orange County, California.

10    LX-0404 (Vernaglia Decl.) ¶ 4.

11

12    6. In June 2006, Parthenon Capital Partners, a private equity firm, acquired and merged Health

13    Line Clinical Laboratories and Westcliff to create Biolabs Inc. with Westcliff becoming a wholly

14    owned subsidiary of Biolabs. LX-0404 (Vernaglia Decl.) ¶ 4; *See* The Dark Daily, "Westcliff

15    Medical Laboratories Files Bankruptcy, Will be Sold to LabCorp," May 24, 2010,

16    http://www.darkdaily.com/westcliff-medical-laboratories-files-bankruptcy-will-be-sold-to-labcor

17    p-524 (last visited Feb. 9, 2011).

18

19    7. Following the merger of Westcliff and HealthLine, Westcliff's management pursued a

20    twofold strategy: (1) acquire several smaller laboratories and (2) increase accession volume in

21    order to increase top-line revenue. *See* The Dark Report, "Did Wrong Strategy Sink Westcliff

22    Medical Labs?," June 1, 2010, at www.darkreport.com.

23

24    8. In Southern California, LabCorp handles all of its routine testing at its regional laboratory in

25    San Diego, California, which processes approximately 80,000 tests or 25,000 accessions per

26    night. PX 1139 at 7.

27

28

4

Case 8:10-cv-01873-AG-MLG Document 157-4 Filed 03/25/11 Page 5 of 41 Page ID #:2183
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 5 of 41 Page ID #:2132
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 4 of 40 Page ID #:1980

9. LabCorp maintains over 200 PSCs in California, over 100 of which are in Southern California, and 14 STAT labs in California. PX 1139 at 7.

10. In 2009, LabCorp had revenues of $4.69 billion. *See* Laboratory Corporation of America Holdings Announces 2009 Fourth Quarter and Full Year Results, Feb. 11, 2010, http://phx.corporate-ir.net/phoenix.zhtml?c=84636&p=irol-newsArticle&ID=1387048&highlight=), of which $174.6 million was derived in Southern California, PX 1149.

11. Westcliff's 2006 merger with Health Line allowed Westcliff to reach the scale necessary to begin competing for and winning capitated physician group business. PX 7013 at 21 (Nicholson Tr.); PX 7003 at 107 (Aicher Tr.).

12. Westcliff's revenues also increased from $78.6 million in 2007 to $95.7 million in 2009. PX 1155.

13. Westcliff handled all of its routine testing at its main laboratory in Santa Ana, California, which processed approximately 9,000 accessions per day. PX 1139 at 7. Westcliff's California operations also included 6 STAT laboratories, an anatomical pathology laboratory in Monrovia, California, and approximately 170 PSCs, over 100 of which were in Southern California. *Id.*

14. At the time of the acquisition, Westcliff was generating profits from its operations and had nearly $100 million in annualized revenue. PX 3018 at 2; *see* PX 7010 at 39-40 (McMahan Tr.).

15. Westcliff had been saddled with an enormous debt load by Parthenon Capital Partners, and by late 2009 Westcliff was unable to meet its repayment obligations on that debt, PX 7010 at 51-54 (McMahan Tr.), and its creditors sought to put the company up for sale.

Case 8:10-cv-01873-AG-MLG Document 157-4 Filed 03/25/11 Page 56 of 141 Page ID
#:2184
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 6 of 41 Page ID
#:2133
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 5 of 40 Page ID
#:1981

1    16. LabCorp explored a possible acquisition of Westcliff for more than one year before

2    intensifying its negotiations with Westcliff in early 2010. PX 1191.

3

4    17. Bids were solicited for the purchase of Westcliff, and a number of letters of intent were

5    received from interested purchasers. PX 3001; PX 3002; PX 3003; PX 3004. In the end,

6    LabCorp entered into an asset purchase agreement on May 17, 2010, to purchase substantially all

7    of Westcliff's assets for $57.5 million, in a transaction not reported under the Hart-Scott-

8    Rodino Antitrust Improvements Act, Revised Jurisdictional Thresholds for Section 7A of the

9    Clayton Act, 75 Fed. Reg. 3,468 (Jan. 21, 2010) (to be codified at 16 C.F.R. pt. 801-803). PX

10    0301.

11

12    18. FTC staff became aware of the transaction on June 2, 2010, and immediately notified

13    LabCorp of staff's potential antitrust concerns regarding the deal. Def.'s Answer ¶ 16 (Dkt. No.

14    69).

15

16    19. LabCorp voluntarily entered into a hold separate agreement on June 25, 2010, to enable FTC

17    staff to perform a substantial investigation. PX 0006; Def.'s Answer ¶ 17 (Dkt. No. 69).

18    LabCorp agreed to maintain the hold separate until at least thirty days after it substantially

19    complied with the Subpoena *Duces Tecum* and Civil Investigative Demand issued to LabCorp

20    on July 2, 2010. PX 0006.

21

22    20. LabCorp certified that it had complied with the Subpoena *Duces Tecum* and Civil

23    Investigative Demand issued by the FTC on November 4, 2010, which set the expiration date of

24    the hold separate agreement at December 3, 2010.

25

26    21. On November 30, 2010, the FTC found that it had "reason to believe" that the transaction

27    violated the antitrust laws and authorized staff to seek both a temporary restraining order

28    ("TRO") and a preliminary injunction to prevent LabCorp from integrating with Westcliff

6

Case 8:10-cv-01873-AG -MLG Document 157-4 Filed 03/25/11 Page 6 of 41 Page ID #:2185
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 7 of 41 Page ID #:2134
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 6 of 40 Page ID #:1982

1   pending the outcome of an administrative trial under Section 7 of the Clayton Act and Section 5

2   of the Federal Trade Commission Act. Compl. for TRO & Prelim. Inj. (Dkt. No. 3).

3

4   22. Simultaneously, the FTC issued an administrative complaint charging that the acquisition

5   violated Section 7 of the Clayton Act and Section 5 of the Federal Trade Commission Act, and

6   ordered that the administrative trial commence on May 2, 2011. Compl., *In the Matter of*

7   *Laboratory Corp. of Am., et al.,* FTC Dkt. No. 9345 (filed Dec. 1, 2010).

8

9   **2.    PRODUCT MARKET**

10

11  23. The FTC alleges that the relevant product market is "the sale of capitated clinical laboratory

12  testing service . . . to physician groups." FTC Mem. 13-14.  The FTC alleges an alternative

13  market of the sale of clinical laboratory testing services to physician groups operating under the

14  delegated managed care model.  FTC Complaint ¶ 20.

15

16  24. Clinical laboratory tests are used to assist in the diagnosis, evaluation, detection, monitoring,

17  and treatment of medical conditions by examining human blood, or other bodily fluids. PX 1139

18  at 6. Clinical laboratory tests are ordered by physicians, who rely on them to diagnose, monitor,

19  and treat their patients. PX 1139 at 6.

20

21  25. Clinical laboratory tests are commonly broken down into categories of STAT, routine, and

22  esoteric.  STAT tests are those for which results are needed immediately. Results for STAT tests

23  are typically reported within four hours of when the specimen is drawn.  LX-0406 (Aicher

24  Decl.).

25

26  26. In California, healthcare services can be delivered to patients through a fee-for-service

27  ("FFS") model or a delegated model. FFS payers include third party payers (such as private

28  health insurance plans), government payers (such as most Medicare and Medi-Cal plans), and



1  direct cash payers (usually patients who are uninsured). PX 0128 at ¶ 3 (████ Decl.);

2  ████ (████) Dep. 35-36, Jan. 14, 2011. Under the FFS model, payers, such as health

3  plans, retain the financial risk of patient care. Thus, the health plans pay physicians and other

4  healthcare providers directly for each healthcare service provided to its insureds. For ancillary

5  services, such as clinical laboratory testing services, health plans and clinical laboratory

6  vendors may enter into a contract establishing a fee schedule for all laboratory testing. *See* PX

7  0108 at ¶ 3 (████ Decl.); ████ (████) Dep. 35-36. The fee schedule is typically set so

8  that health plans pay a negotiated discount off of the Medicare fee schedule.

9

10  27. Clinical laboratory testing services are priced either on an FFS or capitated basis. PX 0128 at

11  ¶ 3 (████ Decl.); ████ (████) Dep. 35-36; PX 0125 at ¶ 3 (████ Decl.).

12

13  28. Physician groups prefer to and almost always do contract for clinical laboratory services on a

14  capitated basis. PX 0102 at ¶ 4 (████ Decl.); ████ (████) Dep. 112, 119; ████

15  (████) Dep. 55; PX 0104 at ¶ 3 (████ Decl.); PX 0108 at ¶ 2 (████ Decl.); ████

16  (████) Dep. 18-19, Jan. 24, 2011; ████ (████) Dep. 39, Jan. 11, 2011; ████ (████)

17  Dep. 100-02; PX 7003 at 77 (Aicher Tr.); PX 7004 at 73 (Harris Tr.); PX 0129 at ¶ 2 ████

18  Decl.); PX 0146 at ¶ 3 (████ Decl.); PX 0119 at ¶ 2 (████ Decl.); PX 0120 at ¶ 3 (████

19  Decl.); PX 0121 at ¶ 2 (████ Decl.); PX 0131 at ¶ 4 (████. Decl.); PX 0132 at ¶ 2

20  (████Decl.); PX 0160 at ¶ 4 (████ Decl.); PX 0161 at ¶ 4 (████ Decl.); PX 0159 at ¶

21  3 (████ Decl.).

22

23  29. Under the delegated managed care model, health maintenance organization ("HMO") health

24  plans delegate specific healthcare services to be performed by physician groups in return for a

25  capitated fee – a fixed payment per member, per month. ████ Dep. 46, Jan. 20, 2011; PX

26  0107 at ¶ 3 (████ Decl.); PX 0108 at ¶ 2 (████ Decl.); PX 0109 at ¶ 2 (████ Decl.); PX

27  0112 at ¶ 3 (████ Decl.); PX 0121 at ¶ 2 (████ Decl.); PX 0122 at ¶ 2 (████ Decl.);

28  PX 0131 at ¶ 4 (████ Decl.); PX 0132 at ¶ 2 (████ Decl.); PX 0146 at ¶ 3 (████

8

1  Decl.); PX 0111 at ¶ 2 (█████ Decl.); ███████ (███) Dep. 112, Jan. 27, 2011; ███ (███████)
2  Dep. 100-01, Jan. 13, 2010; ██████ (████) Dep. 48-50.

3

4  30. Physician groups are entities that provide, or through which its member physicians contract
5  to provide, healthcare services to enrollees of HMO health plans (also called capitated lives),
6  including a group medical practice, independent practice association (sometimes referred to as
7  independent physician association) ("IPA"), physician service organization, management
8  service organization, medical foundation, or physician/hospital organization. PX 0119 at ¶ 2
9  (██████ Decl.); PX 0132 at ¶ 2 (███████ Decl.); PX 0102 at ¶ 4 (██████ Decl.); PX 0108 at ¶ 2
10 (███████ Decl.); PX 0122 at ¶ 1 (██████ Decl.).

11

12 31. Under the delegated managed care model, physician groups are responsible for purchasing
13 ancillary services, including laboratory services, for their HMO patients. PX 0109 at ¶ 2 (███████
14 Decl.); PX 0115 at ¶ 2 (███████████ Decl.); PX 0111 at ¶ 2 (███████ Decl.); PX 0110 at ¶ 2
15 (███████ Decl.); PX0120 at ¶ 3 (██████ Decl.); PX 0121 at ¶ 2 (███████ Decl.); PX 0102 at ¶ 4
16 (██████ Decl.); PX 0159 at ¶ 3 (█████ Decl.); ███████ (██████) Dep. 112. In Southern California,
17 physician groups purchase clinical laboratory services directly from independent commercial
18 laboratories for patients covered by HMO plans. PX 0121 at ¶ 2 (███████ Decl.); PX 0122 at ¶ 2
19 (███████ Decl.); PX 0125 at ¶ 3 (████████ Decl.); ███████ (█████████) Dep. 116-17; PX 0110 at ¶ 2
20 (███████ Decl.); PX 0159 at ¶ 3 (█████ Decl.).

21

22 32. LabCorp estimates that 90% of HMO enrollees in Southern California are covered under
23 capitated laboratory contracts. PX 1148 at 1.

24

25 33. Some physician groups also pay an additional fee for certain laboratory tests that are "carved
26 out" of the capitation rate. PX 0124 at ¶ 3 (███████ Decl.); PX 0116 at ¶ 4 (██████ Decl.); PX
27 0159 at ¶ 5 (█████ Decl.); ███████ (██████) Dep. 35-37; ████████ (█████) Dep. 12-13, 117. For
28 these laboratory tests, the contract between the physician group and the laboratory vendor

9

Case 8:10-cv-01873-AG -MLG Document 145-14 Filed 03/25/19 Page 10 of 41 Page ID
#:2188
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 10 of 41 Page ID
#:2137
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 9 of 40 Page ID
#:1985

1   establishes the price the physician group must pay for each of the carved out tests. The vast

2   majority of clinical laboratory testing falls within the capitation rate. The number and price of

3   carved out tests vary for each physician group customer. ███ (███) Dep. 12-13.

4

5   34. Laboratory vendors offer capitated contracts to physician groups because the contract

6   guarantees fixed monthly revenue for all of the physician group's HMO patients and provides a

7   significant advantage in getting referrals from individual physician members of the physician

8   group to conduct testing for their non-HMO patients. PX 7003 at 61 (Aicher Tr.);

9   PX 7010 at 34-35 (McMahan Tr.); PX 0140 at ¶ 4 (███ Decl.); PX 0128 at ¶ 3 (███

10   Decl.); PX 0104 at ¶ 3 (███ Decl.); PX 0160 at ¶ 5 (███ Decl.); PX 7011 at 52, 63

11   (Whalen Tr.); PX 7000 at 50 (King Tr.). This business is known as "pull-through" business and

12   it is paid for by third parties (such as health plans) on a higher cost FFS basis. PX 7003 at 60

13   (Aicher Tr.); PX 0104 at ¶ 3 (███ Decl.); PX0118 at ¶ 4 (███ Decl.); PX0131 at

14   ¶ 5 (███. Decl.); PX0132 at ¶ 4 (███ Decl.); PX 0136 at 2 (███ Decl.); PX 0140

15   at ¶ 4 (███ Decl.); PX 0117 at ¶ 4 (███ Decl.).

16

17   35. The largest independent clinical laboratory in California is Quest Diagnostics Incorporated

18   ("Quest"), which acquired Unilab Corporation ("Unilab") for approximately $877 million in

19   2003. *In re Quest Diagnostics Incorporated*, FTC Docket No. C-4074, Analysis to Aid Public

20   Comment.

21

22   36. There are at least fifteen other laboratories that currently provide lab services to physician

23   groups in Southern California on a capitated basis. These labs include Consolidated Medical

24   Bio-Analysis, Advanced Medical Analysis Lab, American Bio-Clinical Laboratories, Sun

25   Clinical Laboratories, Foundation Laboratory, Physicians Automated laboratory, Unicare,

26   BioData, ABC Labs, American Clinical Reference Lab, Central Coast Pathology Lab, Memorial

27   Healthtech, Rady Children's Hospital, UCI Laboratory, and Whitefield Laboratories. LX-0407

28   (McCarthy/Wu Decl.) Ex. 5; Ex. 5 (Updated 2/2/2011).

*10*

Case 8:10-cv-01873-AG-MLG Document 157-4 Filed 03/25/11 Page 11 of 41 Page ID
#:2189
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 11 of 41 Page ID
#:2138
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 10 of 40 Page ID
#:1986

37. Other laboratories, although they do not currently have capitated contracts with physician groups, also currently compete to provide clinical laboratory services. For example, Primex, a clinical laboratory based in Van Nuys, California, previously provided clinical lab services to Community Medical Group under a capitated arrangement and submitted a proposal to provide laboratory services to a physician group on a capitated basis as recently as summer 2010. PX0113 (███ Decl.); LX-0407 (McCarthy/Wu Decl.) Ex. 5; Ex. 5 (Updated 2/2/2011); PX0139-003.

38. The FTC admitted in another proceeding involving the same clinical laboratory services in California that the relevant product market should include both FFS and capitated business with IPAs. Compl. ¶ 8, In re Quest Diagnostics Inc. / Unilab Corp., FTC Docket No. C-4074 (Feb. 21, 2003) (Quest / Unilab Compl.).

39. Capitated and FFS billing arrangements are merely two different ways of paying for the same clinical laboratory services. LX-5005 (███ Dep.) 23:9-15; LX-5003 (███ Dep.) 18:5-14, 50:20-51:12; LX-5015 (███ Dep.) 40:5-11.

40. The services provided by clinical labs are identical regardless of payment method. Clinical labs use the same PSCs, same couriers, same equipment, same reagents, same interfaces, same test menu, same STAT labs, same labs, and same employees to perform the same lab tests on both capitated and FFS accessions. LX-5006 (███ Dep.) 20:21-21:10; LX-5005 ███ Dep.) 22:10-22, 43:6-9; LX-5002 (███ Dep.) 46:16-47:15; LX-5004 (Flyer Dep.) 69:19-70:7, 162:10-166:2-7; LX-0647 (Stephenson Decl.).

41. Clinical laboratories that do not currently contract on a capitated basis are capable of doing so since they already provide the fundamental service – clinical lab service. LX-5002 (███ Dep.) 72:17-73:12; 87:4-9.

10

*11*

Case 8:10-cv-01873-AG-MLG   Document 157-4   Filed 03/25/11   Page 12 of 41   Page ID
#:2190
Case 8:10-cv-01873-AG-MLG   Document 143-1   Filed 03/02/11   Page 12 of 41   Page ID
#:2139
Case 8:10-cv-01873-AG-MLG   Document 128   Filed 02/22/11   Page 11 of 40   Page ID
#:1987

42. Expanding the defined product market here to include FFS contracts with IPAs dramatically expands the number of competitors in the market and reduces LabCorp's and Westcliff's market shares significantly because at least 52 of 239 physician groups in California contract on a FFS basis. LX-0209 (Nov. 15, 2010 Leibenluft Letter).

43. Discretionary FFS business from tests billed to physicians, patients, or third-party payers is "highly inter-related" to capitated business. LX-5015 (███████ Dep.) 58:1-18.

44. A capitated rate offered by a lab to an IPA is linked to the lab's estimate of the potential for discretionary FFS revenue the clinical lab hopes to realize from the IPA's physicians. PX-0154 (Flyer Decl.) ¶ 9; LX-5002 (█████ Dep.) 42:17-43:7; LX-5003 (█████ Dep.) 23:14-24:21, 25:5-25:15, 40:20-45:22; LX-2744 (█████); LX-1610 (Feb. 23, 2010, Prospect P&L); LX-1611 (May 4, 2009, Promed P&L); see also LX-5011 (Wu Dep.) 56:20-24, 63:2-17, 274:15-275:24.

45. FTC Commissioner J. Thomas Rosch dissented from the FTC's decision to issue a complaint to challenge LabCorp's acquisition of Westcliff in part because the FTC's alleged product market is "misleading" in that it fails to account for the fact that discretionary FFS business is "inextricably linked" to an IPA's capitated business. LX-0208 (Rosch Dissent) at p. 2.

46. Including discretionary FFS business in the relevant product market dramatically reduces LabCorp's and Westcliff's market shares because there are many clinical labs actively competing for this business. LX-5002 (█████ Dep.) at 66:24-67:14; 80:2-6; 114:12-19.

## 3.  GEOGRAPHIC MARKET

47. The FTC's proposed geographic market spanning all of "Southern California" includes the counties of Imperial, Kern, Los Angeles, Orange, Riverside, San Bernardino, San Diego, San Luis Obispo, Santa Barbara, and Ventura.

/2

Case 8:10-cv-01873-AG -MLG Document 157-4 Filed 03/25/11 Page 13 of 41 Page ID #:2391
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 13 of 41 Page ID #:2140
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 12 of 40 Page ID #:1988

48. The FTC has not alleged market share or market concentration data for any area smaller than "Southern California."

49. Some clinical laboratories treat Southern and Northern California as distinct markets for business purposes. Quest separates its business into Northern and Southern California. Moverley (Quest) Dep. 130. *Compare* PX 5006 (Quest's Northern California Business Unit), *with* PX 5007 (Quest's Southern California Tarzana Business Unit).

50. The entities that the FTC identifies as the relevant customers for clinical laboratory services – the IPAs – require only PSCs in the handful of individual localities where their physicians have offices and where their patients reside. They do not require a clinical lab to have a network of PSCs across all of "Southern California." LX-5003 ( ███ Dep.) 13:2-7; LX-5005 ( ███ Dep.) 46:3-46:11; LX-5001 ( ███ Dep.) 74:11-24; LX-5000 ( ███ Dep.) 25:6-10, 67:4-15; LX-5014 ( ███ Dep) 46:8-47:5; LX-5008 ( ███ Dep.) 39:7-10; LX-5007 ( ███ Dep.) 44:13-19.

51. The FTC has not identified any IPAs that require PSCs covering more than the local geographic area of their IPA physician/patient membership.

52. Dr. Flyer could not identify a single IPA with a geographic coverage larger than two counties. LX-5004 (Flyer Dep.) 123:17-124:8.

53. LabCorp's and/or Westcliff's share of the alleged market is effectively zero in six of the ten counties in "southern California." LX-0642 (Capitated Accessions by County); LX-0641 (Capitated Lives by County); LX-5016 ( ███ Dep.) 46:1-9 ("I don't believe we're running into LabCorp much in Kern County"); Id. 51:15-19 (Q: "In Orange County, are you aware as to whether Westcliff does any capitated business at all in Orange County?" A: I'm not aware of any contracts that Westcliff have [sic] in Orange County, no."). As a result, LabCorp's acquisition

*13*

Case 8:10-cv-01873-AG-MLG Document 157-4 Filed 03/25/11 Page 14 of 41 Page ID #:2192
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 14 of 41 Page ID #:2143
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 13 of 40 Page ID #:1989

1  of Westcliff does not (and could not) present any threat of competitive harm to IPAs in any of

2  those areas.

3

4  54. Both LabCorp and Westcliff have PSCs and laboratory facilities throughout California.

5  PX3064-008 (Westcliff Investor Presentation); PX1139-005 (CID Response).

6

7  55. LabCorp provides clinical lab services throughout California from its lab in San Diego.

8  PX1139-005 (CID Response).

9

10  56. Westcliff provides clinical lab services throughout California and to parts of Arizona from its

11  lab in Santa Ana.  PX3064-008 (Westcliff Investor Presentation).

12

13  57. Both LabCorp and Westcliff are able to provide clinical lab services to customers who are

14  hundreds of miles away from their labs by utilizing low cost airline carriers.  PX1139-005 (CID

15  Response).

16

17  58. A geographic market based on the locations of LabCorp's and Westcliff's respective labs in

18  both Northern and Southern California would reduce the companies' combined market shares

19  because other prominent competitors exist in "Northern California" such as Sutter Health

20  Systems, Hunter Laboratories, and MuirLab.  PX0134 ( █████ Decl.); PX1139-018 (CID

21  Response); PX1139-017 (CID Response); LX-5002 ( ████ Dep.) 72:17-73:12.

22

23  **4.    COMPETITIVE EFFECTS**

24

25  59. By 2007, after years of organic growth and a major consolidation with Health Line

26  Laboratories, Westcliff began to compete successfully for capitated contracts with physician

27  groups in Southern California. Westcliff obtained over 20 capitated physician group contracts

28  since 2007, three of which were subsequently lost (one to LabCorp and two to consolidation

*14*

Case 8:10-cv-01873-AG -MLG Document 157-4 Filed 03/25/11 Page 15 of 41 Page ID #:2193
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 15 of 41 Page ID #:2142
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 14 of 40 Page ID #:1990

1    among physician group customers). PX 3132.

3    60. Since Westcliff began competing for capitated physician group contracts, Westcliff's volume

4    grew from approximately 6,600 accessions per day to 10,000 accessions per day. PX 7011 at 21

5    (Whalen Tr.); PX 7007 at 34 (Vernaglia Tr.).

7    61. By 2009, Westcliff's annual revenues had grown from approximately $44 million before

8    beginning to compete for physician group contracts to over $97 million. PX 3018 at 2; PX 3130

9    at 5.

11    62. LabCorp's managed care monthly sales reports rarely mention any competitor other than

12    Quest or Westcliff. *See, e.g.*, PX 1044, PX 1045, PX 1047, PX 1048, PX 1051, PX 1058.

14    63. LabCorp's Regional Manager of Business Development observed that "Westcliff is

15    [LabCorp's] largest competition besides Quest." PX 1133 at 1.

17    64. The FTC permitted Quest to purchase Unilab with minimal divestiture even though their

18    combined market share was 70 percent and the next largest competitor in the alleged market had

19    only a 4 percent market share. Quest/Unilab Compl. ¶ 13.

21    65. Westcliff entered into capitated contracting and expanded into new geographies in a

22    relatively short period of time. LX-5003 ( █████ Dep.) 31:7-11, 102:25-103:19; LX-5004

23    (Flyer Dep.) 215:16-216:23; LX-0304 ( █████ Decl.).

25    66. There have been some recent new entrants into the "Southern California" market.

27    67. Recently, Sonic purchased two clinical laboratories in "Southern California" and went from

28    having no presence in California to operating in at least four of the ten counties that the FTC

*15*

1  defines as constituting "Southern California." Through its acquisitions, Sonic is now a

2  participant in the alleged market because it already offers capitated contracts to IPAs. PX0140;

3  PX0111. LX-0407 (McCarthy/Wu Decl.) Ex. 5; Ex. 5 (Updated 2/2/2011).

4

5  68. On December 31, 2010, Sonic acquired Physicians Automated Laboratory ("PAL"), which is

6  based in Bakersfield, California. Following the acquisition, Sonic characterized PAL as "a

7  central location from which to build further business in California" and further stated that the

8  acquisition "was the first step in a long-term growth plan for America's most populous state of

9  32 million residents. Sonic plans more purchases in California." *See* LX-0638 (Sonic

10  Healthcare Buys California Clinical Pathology Laboratory Company, Dark Daily, Jan. 17,

11  2011); *see also* LX-0637 (Teresa Ooi, Sonic in $84M Laboratory Spending Spree, The

12  Australian, Jan. 18, 2011.).

13

14  69. PAL currently has two capitated contracts with IPAs. LX-0407 (McCarthy/Wu Decl.) Ex. 5;

15  Ex. 5 (Updated 2/2/2011).

16

17  70. On February 7, 2011, Sonic announced the acquisition of Central Coast Pathology

18  Consultants ("CCPC"), a clinical laboratory with annual revenues of over $20 million that

19  provides services in three Southern California counties (San Luis Obispo, Santa Barbara, and

20  Ventura). *See* Company Announcement, Sonic Healthcare Acquires Second California

21  Laboratory, available at http://www.sonichealthcare.com/ media/64859/942441.pdf.

22

23  71. On January 24, 2011, Pathology, Inc. announced the acquisition of Central Coast Clinical

24  Laboratories ("CCCL"), "a leading California provider of clinical laboratory testing" located in

25  Templeton, California. LX-0639 (⬛⬛⬛ Decl.) Ex. A.

26

27  72. The minimum viable scale to provide capitated lab services is likely less than or equal to

28  1,000 accessions per day. LX-5002 (⬛ Dep.) 66:24-67:14, 71:3-73:12, 86:2-13, 87:4-9;

*16*

1  LX-5004 (Flyer Dep.) 97:3-7.

2

3  73. Many laboratories in California already process 1,000 or more accessions per day. LX-5002

4  (███ Dep.) 71:3-73:12.

5

6  74. Other clinical labs have offered IPAs prices that are lower than LabCorp's and Westcliff's

7  prices. LX-5004 (Flyer Dep.) 71:7-72:14, 73:14-75:4; LX-5011 (Wu Dep.) at 152:15-153:23,

8  209:19-211:4.

9

10  75. Westcliff's expansion into capitated contracting in 2007 represents entry by another

11  competitor into the alleged relevant market. LX-0407 (McCarthy/Wu Decl.) ¶ 30.

12

13  76. Westcliff's expansion did not lead to a reduction in LabCorp's capitated pricing or alter

14  LabCorp's bidding behavior. LX-0407 (McCarthy/Wu Decl.) ¶¶ 30-32; LX-5011 (Wu Dep.)

15  65:25-66:25, 105:16-106:8, 129:14-130:10; LX-2412.

16

17  77. LabCorp customers were not diverted from LabCorp to Westcliff following Westcliff's

18  entry. LX-0407 (McCarthy/Wu Decl.) ¶ 30.

19

20  78. Westcliff offered lower capitation rates to physician groups than LabCorp and Quest. PX

21  1026 at 1 ("████████████████████████████████

22  ████████████████████████████████████

23  ████████████████████████████████████

24  ████████████████████████████████).

25

26  79. To offer capitated contracts to physician groups on competitive terms, a clinical laboratory

27  must have sufficient economies of scale and an extensive network of PSCs providing convenient

28  access for the physician group's entire patient membership. *E.g.*, PX 0128 at ¶¶ 5-6 (████████

16

*17*

Case 8:10-cv-01873-AG -MLG Document 157-4 Filed 03/25/11 Page 18 of 41 Page ID
#:2196
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 18 of 41 Page ID
#:2145
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 17 of 40 Page ID
#:1993

1  Decl.); PX 0138 at ¶ 6 (███ Decl.).

2

3  80. LabCorp's CEO describes the clinical laboratory business as "a high-fixed cost business,

4  whether [a laboratory is] small or large[.]" PX 7000 at 37 (King Tr.). Consequently, as testing

5  volume increases, a laboratory's cost structure decreases, which ultimately allows a laboratory to

6  offer lower capitation rates to physician group customers. PX 0118 at ¶ 6 (███ Decl.); PX

7  0117 at ¶ 6 (███ Decl.); PX 0131 at ¶ 8 (███ Decl.); PX 7007 at 292 (Vernaglia Tr.); *see*

8  PX 0145 at ¶ 6 (███ Decl.) (describing other factors contributing to higher costs).

9

10  81. Because of the high fixed costs, larger laboratories are able to achieve significant benefits by

11  driving more volume through their existing laboratory equipment and infrastructure. PX 7000 at

12  35-39 (King Tr.).

13

14  82. Reputational barriers can make it difficult for a new laboratory to break into the

15  market and displace larger established clinical laboratory vendors. *See, e.g.,* PX 0120 at ¶ 4

16  (███ Decl.); PX 0121 at ¶ 3 (███ Decl.); ███ (███) Dep. 38-41, 43-44.

17

18  83. Dr. Wu, an expert for Defendants, analyzed efficiencies and found ███ in annual

19  efficiencies from both cost and supply savings. LX-0407 (McCarthy/Wu Decl.) ¶ 44-45.

20

21  84. Dr. Wu also analyzed "price compression" and found ███ in annual savings to

22  health plan customers. LX-0407 (McCarthy/Wu Decl.) ¶¶ 47-49.

23

24  85. Dr. Wu calculates that the overall savings to health plan customers will be approximately

25  ███ annually. LX-0407 (McCarthy/Wu Decl.).

26

27

28

*18*

## 5.     EQUITIES

86. Integration of the two companies would result in a "major benefit" for customers by "combining Westcliff's service model with the resources and potential economies of scale" of LabCorp. LX-0301 (Mason Decl.) ¶ 13.

87. LabCorp presented evidence that the transaction will result in over $22 million annually in merger-specific efficiencies resulting from consolidating redundant facilities and employees and taking advantage of LabCorp's lower supply costs. LX-0407 (McCarthy/Wu Decl.) ¶¶ 44-45; LX-5011 (Wu Dep.) 269:11-272:7.

88. Under the Hold Separate Agreement and TRO, LabCorp has been subsidizing the significant inefficiencies of what formerly was Westcliff and is now LabWest. LX-0406 (Aicher Decl.) ¶ 6.

89. LabWest has lost money every month since the acquisition.

90. LabWest ███████ in September 2010. LX-0405 (Rogge Decl.) ¶¶ 6-8.

91. LabWest ███████ in October 2010. LX-0405 (Rogge Decl.) ¶¶ 6-8.

92. LabWest ███████ in November 2010. LX-0405 (Rogge Decl.) ¶¶ 6-8.

93. LabWest ███████ in December 2010. LX-0652 (Rogge Decl.) ¶ 6

94. LabWest's total losses since the acquisition ███████ LX-0652 (Rogge Decl.) ¶ 6; LX-0405 (Rogge Decl.) ¶¶ 6-8.

*19*

Case 8:10-cv-01873-AG -MLG Document 157-4 Filed 03/25/11 Page 20 of 41 Page ID #:2198
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 20 of 41 Page ID #:2147
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 19 of 40 Page ID #:1995

95. Measuring LabWest accession numbers by month, they have decreased steadily every month since August 2010 from a total of almost ▮▮▮ in August to under ▮▮▮ accessions in December 2010. LX-0652 (Rogge Decl.) ¶ 6.

96. Comparing LabWest's accessions on a per revenue day year-over-year – 2009 to 2010 – accessions are down roughly ▮▮▮ percent from June 2010 to December 2010 as compared to the same time period in 2009. LX-0405 (Rogge Decl.) ¶ 14; LX-0652 (Rogge Decl.) ¶ 10; PX3120.

97. LabCorp has loaned LabWest more than ▮▮▮▮▮ LX-0405 (Rogge Decl.) ¶ 16; LX-0653 (Shoemaker Decl.) ¶¶ 11-12.

98. The substantial monthly losses are expected to continue until LabCorp is able to integrate the former Westcliff business. LX-0405 (Rogge Decl.) ¶ 10.

99. The extended length of the hold separate has created tremendous uncertainty for the employees of LabWest resulting in loss of key employees. LX-5009 (Shoemaker Dep.) 39:16-40:5.

100. The hold separate prevents LabCorp and LabWest from eliminating duplicative operations and from realizing other expected efficiencies. LX-0406 (Aicher Decl.) ¶¶ 18-31; LX-0405 (Rogge Decl.) ¶¶ 5-13, LX-0403 (Shoemaker Decl.) ¶¶ 10-16.

101. Allowing integration will better preserve the viability and value of those assets if a divestiture is ordered at some later date. LX-0653 (Shoemaker Decl.)

102. Post-integration, LabCorp will be able to reduce staff in the courier department. Many existing Westcliff PSCs are situated on routes that LabCorp couriers already serve. Ultimately

19

20

1    LabCorp believes that between ████████ courier positions can be eliminated, generating a

2    monthly savings of ██████ Additionally, LabCorp estimates that by combining with

3    Westcliff it will be able to reduce outside-courier expenses by about █████ per month.  The

4    full savings associated with the integration will be realized in month eight.  PX1139-0049 (CID

5    Response).

6

7    103. Based on the current schedule and the FTC's Rules of Practice, the earliest the FTC would

8    likely decide the administrative case would be in early 2012.  *See* FTC Rules of Practice, §§

9    3.41 (allowing a hearing of 210 hours, typically lasting between six and nine weeks), 3.46

10   (post-hearing briefing – 31 total days), 3.51 (initial 70-day decision and 30-day extension), 3.52

11   (appeal to FTC – minimum of 55 days), and 3.54 (FTC decision – 45 days).  However, even

12   though the FTC has had a rule limiting its own time for decisions since at least 1994 (currently

13   45 days), it has apparently not followed its own timing constraints in antitrust cases.  *See*, e.g.,

14   http://ftc.gov/os/adjpro/adjprepprocedures.pdf; cf. *In re Rambus*, docket at

15   http://ftc.gov/os/adjpro/d9302/index.shtm (First Opinion issued twenty-three months after oral

16   argument; Final Opinion issued eight months later); *In re Chicago Bridge*, docket at

17   http://ftc.gov/os/adjpro/d9300/index.shtm (Opinion issued fourteen months after oral argument;

18   final opinion with divestiture issued five years after oral argument).  The FTC's most recent

19   post-acquisition merger challenge, *In re Polypore*, was filed on September 10, 2008 and a final

20   Opinion issued on December 10, 2010.  Docket found at http://ftc.gov/os/adjpro/d9327/

21   index.shtm.  The case is on appeal.

22

23   104. The FTC has ordered that a hearing begin in this case on May 2, 2011. PX 0010 at 4.

24

25   105. While the FTC rules were changed about two years ago in part to speed up the

26   administrative process, 74 Fed. Reg. 20,205 (May 1, 2009), that process remains a long,

27   drawn-out ordeal.  Each of the FTC's post-consummation merger challenges over the past ten

28   years has lasted at least two years and one lasted over seven years. *See In re Chicago Bridge*,

*21*

1   FTC Docket No. 9300, available at http://www.ftc.gov/os/adjpro/d9300/index.shtm; *In re*

2   *Polypore.*, FTC Docket No. 9327, available at http://www.ftc.gov/os/adjpro/d9327/index.shtm;

3   *In re Evanston Northwest Hospital Corp. & ENH Med. Group, Inc.*, FTC Docket No. 9315,

4   available at http://www.ftc.gov/os/adjpro/d9315/index.shtm; *FTC v. Ovation Pharmaceuticals,*

5   *Inc.*, FTC File No. 0810156, available at http://www.ftc.gov/os/caselist/0810156/index.shtm.

6

7   106. The FTC is seeking to hold-separate products, laboratories, and courier services that it does

8   not allege are in the relevant product market, including testing reimbursed on a fee-for-service

9   basis by health plans, physicians, and patients in "Southern California." Plaintiff's Proposed

10   Order.

11

12   107. The FTC is seeking to hold separate products that are outside of the FTC's alleged

13   geographic market, including LabWest's clinical laboratory services business in "Northern

14   California" and Arizona. Plaintiff's Proposed Order.

15

16   108. The FTC is seeking to hold separate products in parts of "Southern California" in which

17   LabCorp and Westcliff do not compete against each other for the alleged capitated contracts,

18   such as in Orange, Kern, San Luis Obispo, Ventura, Imperial, and San Diego Counties.

19   Plaintiff's Proposed Order; LX-0641; LX-0642.

20

21   109. If LabCorp and LabWest were to integrate and a court was later to determine that a

22   divestiture was required to restore competition, LabCorp likely could divest the integrated assets

23   in a timely fashion. LX-0406 (Aicher Decl.) ¶ 31.

24

25   110. The Court finds that there may be extensive delays here between the commencement of the

26   FTC administrative action and a final disposition on the merits.

27

28   111. The Court finds that there is a real possibility that a preliminary injunction here would

22

Case 8:10-cv-01873-AG -MLG   Document 157-4   Filed 03/25/11   Page 23 of 41   Page ID #:2201
Case 8:10-cv-01873-AG -MLG   Document 143-1   Filed 03/02/11   Page 23 of 41   Page ID #:2150
Case 8:10-cv-01873-AG -MLG   Document 128   Filed 02/22/11   Page 22 of 40   Page ID #:1998

1 financially devastate or destroy LabWest.

2

3 **CONCLUSIONS OF LAW**

4

5     The Court makes these conclusions of law, including any conclusions of law found in the

6 Findings of Fact.

7

8 **1.    LEGAL STANDARD AND BURDEN-SHIFTING**

9

10 112. This is an action under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), by which the FTC

11 seeks a preliminary injunction ordering LabCorp to preserve and hold separate the Westcliff

12 assets that LabCorp acquired pending administrative adjudication of the underlying merits of

13 whether the acquisition violates Section 7 of the Clayton Act, 15 U.S.C. § 18, or Section 5 of the

14 FTC Act, 15 U.S.C. § 45. Section 13(b) of the FTC Act.  15 U.S.C. § 53(b), authorizes the FTC

15 to seek a preliminary injunction to aid its enforcement of, inter alia, Section 7 of the Clayton

16 Act, 15 U.S.C. § 18.

17

18 113. The FTC is vested with authority and responsibility for enforcing, inter alia, Section 7 of

19 the Clayton Act. Clayton Act § 11(a), 15 U.S.C. § 21(a). The FTC has jurisdiction to issue an

20 order of divestiture, after an administrative hearing on the merits, against LabCorp, if the FTC

21 determines that the acquisition violates Section 7 of the Clayton Act. *FTC v. Cardinal Health,*

22 *Inc.*, 12 F. Supp. 2d 34, 45 (D.D.C. 1998).

23

24 114. The acquisition is a transaction subject to Section 7 of the Clayton Act, 15 U.S.C. § 18, and

25 Section 5 of the FTC Act, 15 U.S.C. § 45.

26

27 115. At all relevant times, LabCorp and its relevant operating subsidiaries were engaged in

28 "commerce," as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the

Case 8:10-cv-02333-JVS-JDE Document 57-4 Filed 03/15/19 Page 24 of 41 Page ID #:2202
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 24 of 41 Page ID #:2151
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 23 of 40 Page ID #:1999

1  Clayton Act, 15 U.S.C. § 12.

2

3  116. This Court has jurisdiction over the subject matter of this action under 15 U.S.C. §§ 26 and

4  53(b), and under 28 U.S.C. §§ 1331, 1337, and 1345.

5

6  117. This Court has jurisdiction over the persons of the defendants as they transact business in

7  this district. 15 U.S.C. § 53(b).

8

9  118. Venue is proper in this district under 28 U.S.C. § 1391 (b) and (c). Venue is also proper

10  under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and under Section 12 of the Clayton Act,

11  15 U.S.C. § 22.

12

13  119. This Court has jurisdiction to issue a preliminary injunction ordering LabCorp to preserve

14  and hold separate the Westcliff assets that LabCorp acquired pending adjudication of the legality

15  of the acquisition by the FTC. 15 U.S.C. § 53(b).

16

17  120. The FTC's ongoing administrative action will determine whether the acquisition violates

18  Section 7 of the Clayton Act, as amended.

19

20  121. Section 7 of the Clayton Act is concerned with preventing the creation or enhancement of

21  market power. *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577, 87 S. Ct. 1224, 1229, 18 L.

22  Ed. 2d 303, 309 (1967); *see United States v. Archer-Daniels Midland Corp.*, 866 F.2d 242, 246

23  (8th Cir. 1988) (The lawfulness of an acquisition turns on the purchaser's "potential for creating,

24  enhancing, or facilitating the exercise of market power – the ability of one or more firms to raise

25  prices above competitive levels for a significant period of time."). Because Section 7 "creates a

26  relatively expansive definition of antitrust liability," a "plaintiff need only prove that [the

27  acquisition's] effect 'may be substantially to lessen competition.'" *Cal. v. Am. Stores Co.*, 495

28  U.S. 271, 284, 110 S. Ct. 1853, 1860, 109 L. Ed. 2d 240, 254 (1990); *see also  FTC v. Warner*

24

1  *Commc'ns, Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984) (per curiam) ("The 'core question [in a

2  Section 7 case] is whether a merger may substantially lessen competition.'") (quoting *Procter &*

3  *Gamble*, 386 U.S. 568, 577, 87 S. Ct. 1224, 1229, 18 L. Ed. 2d 303, 309 (1967)).

4

5  122. The focus of Section 7 is on arresting anticompetitive mergers "in their incipiency," *Brown*

6  *Shoe Co. v. U.S.*, 370 U.S. 294, 317, 82 S. Ct. 1502, 1520, 8 L. Ed. 2d 510, 531 (1962), and thus

7  requires a prediction as to the merger's impact on future competition. *United States v. Phila.*

8  *Nat'l Bank*, 374 U.S. 321, 362, 83 S. Ct. 1715, 1741, 10 L. Ed. 2d 915, 944 (1963). The Clayton

9  Act was "intended to reach incipient monopolies and trade restraints outside the scope of the

10  Sherman Act." *Brown Shoe*, 370 U.S. at 318 n.32. The object of the Clayton Act was to prevent

11  acquisitions or mergers *before* they created competitive harm. "The intent . . . [was] to cope with

12  monopolistic tendencies in their incipiency and well before they have attained such effects as

13  would justify a Sherman Act proceeding." *Brown Shoe*, 370 U.S. at 318 n.32 (quoting S. Rep.

14  No. 1775, 81st Cong., 2d Sess. 4-5); *see* 15 U.S.C. § 18.

15

16  123. The traditional analysis of the likely anticompetitive effects of an acquisition begins with

17  determinations of (1) the "line of commerce" or product market in which to assess the

18  transaction; (2) the "section of the country" or geographic market in which to assess the

19  transaction; and (3) the transaction's probable effect on concentration in the product and

20  geographic markets. *U.S. v. Marine Bancorp.*, 418 U.S. 602, 618-23, 94 S. Ct. 2856, 2868-71, 41

21  L. Ed. 2d 978, 993-97 (1974); *Warner Commc'ns*, 742 F.2d at 1160; *FTC v. H.J. Heinz Co.*, 246

22  F.3d 708, 713 (D.D.C. 2001); *Chi. Bridge & Iron Co.N.V. v. FTC*, 534 F.3d 410, 422-23 (5th

23  Cir. 2008); *FTC v. Univ. Health Inc.*, 938 F.2d 1206, 1218 (11th Cir. 1991).

24

25  124. However, "this analytical structure does not exhaust the possible ways to prove a § 7

26  violation on the merits, much less the ways to demonstrate a likelihood of success on the merits

27  in a preliminary proceeding." *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1036 (D.C. Cir.

28  2008) (Brown, J.) (internal citations omitted); *see also* Fed. Trade Comm'n and U.S. Dep't of

25

Case 8:10-cv-01873-AG -MLG Document 157-4 Filed 03/25/11 Page 26 of 41 Page ID #:2204
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 26 of 41 Page ID #:2153
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 25 of 40 Page ID #:2001

1 Justice, *Horizontal Merger Guidelines* § 4.0 (2010) ("*Merger Guidelines*") (PX0002) ("The

2 Agencies' analysis need not start with market definition.").

3

4 125. Evidence establishing undue concentration in the relevant market makes out the

5 government's prima facie case and gives rise to a presumption of unlawfulness. *Phila. Nat'l*

6 *Bank*, 374 U.S. at 363 ( "a merger which produces a firm controlling an undue percentage share

7 of the relevant market, and results in a significant increase in the concentration of firms in the

8 market is so inherently likely to lessen competition substantially that it must be enjoined in the

9 absence of evidence clearly showing that the merger is not likely to have such anticompetitive

10 effects."); *see also U.S. v. Gen. Dynamics Corp.*, 415 U.S. 486, 497, 94 S. Ct. 1186, 1194, 39 L.

11 Ed. 2d 530, 542 (1974) (quoting *U.S. v. Aluminum Co. of Am.*, 377 U.S. 271, 279, 84 S. Ct.

12 1283, 1288, 12 L. Ed. 2d 314, 319 (1964) ("if concentration is already great, the importance of

13 preventing even slight increases in concentration is correspondingly great.")).

14

15 126. Once the government has established a prima facie violation of Section 7 based on the

16 market share statistics, it is "incumbent upon [the defendant] to show that the market-share

17 statistics gave an inaccurate account of the acquisition's probable effects on competition." *U.S.*

18 *v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 120, 95 S. Ct. 2099, 2118, 45 L. Ed. 2d 41, 66 (1975);

19 *see Olin Corp. v. FTC*, 986 F.2d 1295, 1305 (9th Cir. 1993); *Heinz*, 246 F.3d at 715; *U.S. v.*

20 *Baker Hughes Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990).

21

22 127. "[T]he more compelling the prima facie case, the more evidence the defendant must present

23 to rebut it successfully." *Heinz*, 246 F.3d at 725 (quoting *Baker Hughes*, 908 F.2d at 991). If the

24 defendant comes forward with evidence sufficient to rebut the presumption, the burden of

25 producing further evidence of anticompetitive effect shifts to the government, which retains the

26 ultimate burden of proof at all times. *Baker Hughes*, 908 F.2d at 982-83.

27

28 128. The FTC may establish a rebuttable presumption that a merger has "an appreciable danger"

26

Case 8:10-cv-01873-AG -MLG   Document 157-4   Filed 03/25/11   Page 27 of 41   Page ID
#:2205
Case 8:10-cv-01873-AG -MLG   Document 143-1   Filed 03/02/11   Page 27 of 41   Page ID
#:2154
Case 8:10-cv-01873-AG -MLG   Document 128   Filed 02/22/11   Page 26 of 40   Page ID
#:2002

1    of anticompetitive consequences by showing "that the merger would produce a firm controlling

2    an undue share of the relevant market and would result in a significant increase in the

3    concentration of the market." *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 116 (D.D.C. 2004)

4    (citing *Heinz*, 246 F.3d at 715).

5

6    129. If the FTC establishes such a presumption, a defendant may rebut that presumption by

7    producing evidence that the "market-share statistics produce an inaccurate account of the

8    merger's probable effects on competition in the relevant market." *Arch Coal.*, 329 F. Supp. 2d

9    109, 116 (D.D.C. 2004) (citation omitted).

10

11    130. Section 13(b) of the FTC Act provides that a preliminary injunction may be granted "[u]pon

12    a proper showing that, weighing the equities and considering the Commission's likelihood of

13    ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b)(2).

14

15    131. Section 13(b) of the FTC Act imposes a two-part "public interest" standard for a court to

16    use to determine whether a preliminary injunction should be granted. Under that standard, this

17    Court should: "1) determine the likelihood that the Commission will ultimately succeed on the

18    merits and 2) balance the equities." *Warner Commc'ns*, 742 F.2d at 1159-60 (citing *FTC v.*

19    *Weyerhaeuser Co.*, 665 F.2d 1072, 1082 (D.C. Cir. 1981) (Ginsburg, R., J.)); *Heinz*, 246 F.3d at

20    714. These two factors are assessed on a sliding scale – that is, the greater the showing that the

21    public equities favor a preliminary injunction, the lower the FTC's burden on the likelihood of

22    success on the merits (and vice versa). *Whole Foods*, 548 F.3d at 1035; *see Heinz*, 246 F.3d at

23    726; *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 903 (7th Cir. 1989) (Posner, J.); *FTC v. CCC*

24    *Holdings, Inc.*, 605 F. Supp. 2d 26, 35 (D.D.C. 2009). The equities will often weigh in favor of

25    the FTC, since "'the public interest in effective enforcement of the antitrust laws' was

26    Congress's specific 'public equity consideration' in enacting" Section 13(b). *Whole Foods*, 548

27    F.3d at 1035 (Brown, J.) (citing *Heinz*, 246 F.3d at 726); *Univ. Health,* 938 F.2d at 1225.

28

Case 8:10-cv-01873-AG -MLG Document 157-4 Filed 03/25/11 Page 28 of 41 Page ID
#:2206
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 28 of 41 Page ID
#:2155
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 27 of 40 Page ID
#:2003

1    132. But this "sliding scale" approach does not eliminate the FTC's need to demonstrate a

2    likelihood of success on the merits. *See, e.g., Sifre v. Wells Fargo Bank*, No.

3    3:10-cv-00572-RCJ-VPC, 2010 WL 5476788, at *2 (D. Nev. Dec. 30, 2010); *see also CCC*

4    *Holdings*, 605 F. Supp. 2d at 76 (applying "serious question" standard and devoting almost 40

5    pages to evaluating the FTC's likelihood of success on the merits); *Whole Foods*, 548 F.3d at

6    1035 (finding that a court may not "simply rubber-stamp an injunction whenever the FTC

7    provides some threshold evidence" and "must evaluate the FTC's chance of success on the basis

8    of all the evidence before it"); *FTC v. Freeman Hosp.*, 69 F.3d 260, 267 (8th Cir. 1995) ("[W]e

9    rejected the Commission's argument that it need only show a 'fair or tenable chance of ultimate

10   success on the merits' in order to qualify for injunctive relief.").

11

12   133. The unique "public interest" standard for the injunctive relief sought by the FTC under

13   Section 13(b) differs from the more stringent, traditional four part test for preliminary injunctive

14   relief that applies to suits brought by private parties. *Warner Commc'ns*, 742 F.2d at 1159-60

15   ("Section 13(b) places a lighter burden on the Commission than that imposed on private litigants

16   by the traditional equity standard; the Commission need not show irreparable harm to obtain a

17   preliminary injunction."); *FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980). In

18   enacting section 13(b), Congress explicitly intended "to maintain the statutory or 'public

19   interest' standard which is now applicable, and not to impose the traditional 'equity' standard of

20   irreparable damage, probability of success on the merits, and that the balance of hardships favors

21   the petitioner." *Weyerhaeuser*, 665 F.2d at 1081 (quoting H.R. Rep. No. 73-624, at 31 (1973)

22   (Conf. Rep.), reprinted in 1973 U.S.C.C.A.N. 2523).

23

24   134. Section 13(b) was enacted explicitly to preserve the FTC's ability to order effective,

25   ultimate relief upon completion of its administrative proceedings. H.R. Rep. No. 73-624, at 31;

26   *see Whole Foods*, 548 F.3d at 1042 (Tatel, J., concurring) ("[T]he FTC – an expert agency acting

27   on the public's behalf – should be able to obtain injunctive relief more readily than private

28   parties . . . ."); *Heinz*, 246 F.3d at 714. The "only purpose of a proceeding under [Section 13(b)]

28

Case 8:10-cv-01873-AG-MLG Document 157-4 Filed 03/25/11 Page 29 of 41 Page ID
#:2207
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 29 of 41 Page ID
#:2156
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 28 of 40 Page ID
#:2004

1   is to preserve the status quo until [the] FTC can perform its function." *FTC v. Food Town Stores,*

2   *Inc.*, 539 F.2d 1339, 1342 (4th Cir. 1976); *accord Whole Foods*, 548 F.3d at 1035 (Brown, J.).

3

4   135. Thus, the Court's "task is not to make a final determination on whether the proposed

5   [acquisition] violates section 7, but rather to make only a preliminary assessment of the

6   [acquisition]'s impact on competition." *Heinz*, 246 F.3d at 714 (citing *Univ. Health*, 938 F.2d at

7   1217-18); *Warner Commc'ns*, 742 F.2d at 1162; *see also FTC v. Swedish Match N. Am., Inc.*,

8   131 F. Supp. 2d 151, 156 (D.D.C. 2000); *Cardinal Health*, 12 F. Supp. 2d at 45; *FTC v. Staples,*

9   *Inc.*, 970 F. Supp. 1066, 1070-71 (D.D.C. 1997).

10

11   136. The FTC "need not prove that the proposed merger would in fact violate Section 7 of the

12   Clayton Act. 'The determination of whether the acquisition actually violates the antitrust laws is

13   reserved for the Commission and is, therefore, not before this Court.'" *Cardinal Health*, 12 F.

14   Supp. 2d at 45 (quoting *Staples*, 970 F. Supp. at 1070).

15

16   137. The FTC satisfies its burden to show likelihood of success "if it raise[s] questions going to

17   the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough

18   investigation, study, deliberation and determination by the FTC in the first instance and

19   ultimately by the Court of Appeals." *Warner Commc'ns*, 742 F.2d at 1162 (quotation and

20   citation omitted); *Whole Foods*, 548 F.3d at 1035 (Brown, J.); *Heinz*, 246 F.3d at 714-15; *FTC v.*

21   *Tenet Health Care Corp.*, 186 F.3d 1045, 1051 (8th Cir. 1999); *Univ. Health,* 938 F.2d at 1218.

22   In deciding whether the FTC has made such a showing, the Court should "bear in mind the FTC

23   will be entitled to a presumption against the merger on the merits, *see Elders Grain*, 868 F.2d at

24   906, and therefore does not need detailed evidence of anticompetitive effect at this preliminary

25   phase." *Whole Foods*, 548 F.3d at 1035 (Brown, J.).

26

27   138. In all cases, "the judge remains obligated to exercise independent judgment on the propriety

28   of issuance of a temporary restraining order or a preliminary injunction. Independent judgment

29

1 is not exercised when a court responds automatically to the agency's threshold showings."

2 *Weyerhaeuser*, 665 F.2d at 1082 (quotation omitted).

3

4 139. The Court need not resolve conflicts of evidence or analyze extensively all antitrust issues;

5 that is the role of the administrative proceeding. *Warner Commc'ns*, 742 F.2d at 1164 ("the issue

6 in this action for preliminary relief is a narrow one, we do not resolve the conflicts in the

7 evidence, compare concentration ratios and effects on competition in other cases, or undertake

8 an extensive analysis of the antitrust issues."); *Whole Foods* 548 F.3d at 1042, 1048 (Tatel, J.,

9 concurring) (the district court's job is not to pick between two expert theories, for when it does

10 so, it "trench[es] on the FTC's role when [the court] choose[s] between plausible, well-supported

11 expert studies."); *FTC v. Lancaster Colony Corp.*, 434 F. Supp. 1088, 1094, 1096 (S.D.N.Y.

12 1977) ("Surely, we are not required, on a Section 13(b) application, to examine the economic

13 characteristics of the entire [market] or to try the case. As a practical matter, a district court can

14 hardly do more at so early a stage of antitrust litigation than to make a considered estimate of the

15 FTC's apparent chances of success based upon what must necessarily be an imperfect,

16 incomplete and fragile factual basis.").

17

18 140. This Court is particularly concerned about granting provisional relief that would have huge

19 economic consequences including the possible destruction of LabWest. In the administrative

20 trial now set for May 2, 2011, there will be procedural and due process protections not fully

21 available in the present proceedings.

22

23 **2.    LIKELIHOOD OF SUCCESS ON THE MERITS**

24

25 141. "The FTC bears the burden of proof and persuasion in defining the relevant market." *Arch*

26 *Coal*, 329 F. Supp. 2d at 119 (citing *United States, v. Sungard Data Sys.*, 172 F. Supp. 2d 172,

27 182-83 (D.D.C. 2001); *United States v. Engelhard Corp.*, 970 F. Supp. 1463, 1466 (M.D. Ga.

28 1997) ("In order to prevail, the Plaintiff must carry the burdens of proof and persuasion

*30*

Case 8:10-cv-01873-AG -MLG Document 157-4 Filed 03/25/11 Page 31 of 41 Page ID
#:2209
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 31 of 41 Page ID
#:2158
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 30 of 40 Page ID
#:2006

1   regarding market definition."), aff'd, 126 F.3d 1302 (11th Cir. 1997).

2

3   142. The failure to properly define a relevant market may lead to the dismissal of a Section 7

4   claim. *See, e.g., Freeman Hosp.*, 69 F.3d at 268 ("Without a well-defined relevant market, an

5   examination of a transaction's competitive effects is without context or meaning."); *Engelhard*

6   *Corp.*, 970 F. Supp. at 1485 ("If the market is incorrectly defined, the market shares will have no

7   meaning.").

8

9   143. "Not only is the proper definition of the relevant . . . market the first step in [a] case, it is

10  also the key to the ultimate resolution of this type of case, since the scope of the market will

11  necessarily impact any analysis of the anti-competitive effects of the transaction." *Sungard Data*

12  *Sys.*, 172 F. Supp. 2d at 181; *Marine Bancorp.*, 418 U.S. at 618-623 (Market definition is the

13  first step in the analysis.); *Arch Coal*, 329 F. Supp. 2d at 116-17 ("[A]ntitrust theory and

14  speculation cannot trump facts, and even Section 13(b) cases must be resolved on the basis of

15  the record evidence relating to the market and its probable future.").

16

17  144. Courts place products in the same product market where there is either effective

18  demand-side substitution or effective supply-side substitution. *Compare Brown Shoe*, 370 U.S.

19  294 (demand substitution) *with Twin City SportService, Inc. v. Charles O. Finley & Co.*, 512

20  F.2d 1264 (9th Cir. 1975) (supply substitution).

21

22  145. Demand-side substitution refers to customers' decisions to purchase Product B rather than

23  A because B is an adequate substitute for A.

24

25  146. Supply-side substitution refers to the ability of producers of Product B to switch to

26  producing Product A.

27

28

*31*

Case 8:10-cv-01873-AG -MLG Document 157-4 Filed 03/25/11 Page 32 of 41 Page ID #:2310
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 32 of 41 Page ID #:2159
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 31 of 40 Page ID #:2007

147. Courts also generally find that a cluster of related products are in the same relevant product market when they are sold by the merging parties or when the prices of the products are interdependent, or both. *See, e.g., U.S. v. Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350 (1970); *Cal. v. Sutter Health System, et al.*, 130 F. Supp. 2d 1109, 1119 (N.D. Cal. 2001) ("[A]cute inpatient care" is the relevant market, even though "one cannot substitute a tonsillectomy for heart bypass surgery."); *Reazin v. Blue Cross and Blue Shield of Kan., Inc.*, 899 F.2d 951, 959 n. 10 (10th Cir.1990) (holding that "self-insurance" is part of market for private health care financing).

148. A relevant product market defines the product boundaries within which competition meaningfully exists. *U.S. v. Continental Can Co.*, 378 U.S. 441, 449, 84 S. Ct. 1738, 1743, 12 L. Ed. 2d 953, 959 (1964). "The outer boundaries of a product market are determined by the reasonable interchangeability of use [by consumers] or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325.

149. "The proper point of departure in any discussion of the relevant product market" is the "rule of reasonable interchangeability." *Twin Cities SportsService, Inc.*, 512 F.2d at, 1271. Thus, product market definition hinges "on a determination of those products to which consumers will turn, given reasonable variations in price." *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 767 (9th Cir. 2001); *see also Olin*, 986 F.2d at 1298-99.

150. Courts routinely recognize that otherwise identical products are not in separate markets simply because consumers pay for those products in different ways. *See, e.g., Little Rock Cardiology Clinic P.A. v. Baptist Health*, 591 F.3d 591, 597 (8th Cir. 2009) (finding that defining a market based on "how consumers pay . . . lacks support in both logic and law"); *HTI Health Servs. Inc. v. Quorom Health Group, Inc.*, 960 F. Supp. 1104, 1120 (S.D. Miss. 1997) (rejecting managed care provider market "based on the distinct discount pricing that is associated with managed care purchases . . . as myopic").

Case 8:10-cv-01873-AG -MLG Document 157-4 Filed 03/02/11 Page 33 of 41 Page ID
#:2211
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 33 of 41 Page ID
#:2160
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 32 of 40 Page ID
#:2008

151. Similarly, courts also have explicitly rejected the notion that various methods of paying for healthcare (HMO, PPO, etc.) are in separate product markets even though these payment methods have "consequences . . . for the allocation of the risk of medical expenses." *See, e.g., Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1409-11 (7th Cir. 1995) (Posner, J.) (HMOs do not constitute a separate market because they compete "not only with each other but also with the various types of fee-for-service provider[s]").

152. The mere fact that there are price differences between products does not preclude placing the products in the same relevant market because "price differentials . . . are relevant . . . but not determinative of the product market issue." *Continental Can*, 378 U.S. at 455; *see also U.S. v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 395 (1956) (finding products reasonably interchangeable despite substantial price difference); *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216 (2d Cir. 1999); *Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*, 12 F.3d 609 (6th Cir. 1993); *Nifty Foods Corp. v. Great Atl. & Pac. Tea Co.*, 614 F.2d 832 (2d Cir. 1980); *Liggett & Myers, Inc. v. FTC*, 567 F.2d 1273 (4th Cir. 1977); *Twin City Sportservice, Inc.*, 512 F.2d 1264; *Engelhard Corp.*, 970 F. Supp. at 1484 ("The Merger Guidelines 5%-10% test is an inaccurate barometer of cross-elasticity of demand as to the facts presented in this case.").

153. Just as the product market analysis identifies the products that might plausibly be used by consumers to constrain a price increase, geographic market analysis defines the region "in which the seller operates, and to which the purchaser can practicably turn for suppliers." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S. Ct. 623, 628, 5 L. Ed. 2d 580, 587 (1961); *see Merger Guidelines* § 4.2.

154. In merger cases, the starting point for defining the relevant geographic market is the identification of "the area in which the goods or services at issue are marketed to a significant degree by the acquired firm." *Marine Bancorp.*, 418 U.S. at 621.

Case 8:10-cv-01873-AG-MLG Document 157-4 Filed 03/25/11 Page 34 of 41 Page ID #:2212
Case 8:10-cv-01873-AG-MLG Document 143-1 Filed 03/02/11 Page 34 of 41 Page ID #:2161
Case 8:10-cv-01873-AG-MLG Document 128 Filed 02/22/11 Page 33 of 40 Page ID #:2009

1   155. The boundaries of a relevant geographic market need not be defined with "scientific

2   precision," *U.S. v. Conn. Nat'l Bank,* 418 U.S. 656, 669, 94 S. Ct. 2788, 2796, 41 L. Ed. 2d

3   1016, 1028 (1974), or "by metes and bounds as a surveyor would lay off a plot of ground." *U.S.*

4   *v. Pabst Brewing Co.*, 384 U.S. 546, 549, 86 S. Ct. 1665, 1669, 16 L. Ed. 2d 765, 769 (1966).

5   Rather, the relevant geographic market should "correspond to the commercial realities of the

6   industry," *Brown Shoe*, 370 U.S. at 336, and be "sufficiently defined so that the Court

7   understands in which part of the country competition is threatened." *Cardinal Health*, 12 F.

8   Supp. 2d at 49.

9

10   156. As the *Oracle* Court explained, "[a] presumption of anticompetitive effects from a

11   combined share of 35% in a differentiated products market is unwarranted," and "essentially a

12   monopoly or dominant position" is required "[t]o prevail on a differentiated products unilateral

13   effects claim." *U.S. v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1123 (N.D. Cal. 2004); *see also*

14   Commentary on the Horizontal Merger Guidelines at 26 ("As an empirical matter, the unilateral

15   effects challenges made by the Agencies nearly always have involved combined shares greater

16   than 35%.").

17

18   157. Market shares must be measured in a proper relevant product and geographic market;

19   alleging market shares in some other market is inadequate. *Marine Bancorp., Inc.*, 418 U.S. at

20   618 ("Determination of the relevant product and geographic markets is a necessary predicate to

21   deciding whether a merger contravenes the Clayton Act.") (citation and quotation omitted); *see*

22   *also E. I. du Pont de Nemours*, 353 U.S. at 593 ("Determination of the relevant market is a

23   necessary predicate to a finding of a violation of the Clayton Act because the threatened

24   monopoly must be one which will substantially lessen competition 'within the area of effective

25   competition.' Substantiality can be determined only in terms of the market affected.").

26

27   158. If entry into the alleged relevant market is easy, then competitive effects are unlikely even

28   in a highly-concentrated market. *Am. Stores.*, 872 F.2d at 842-43 ("An absence of entry barriers

34

Case 8:10-cv-01873-AG -MLG   Document 157-4   Filed 03/02/11   Page 35 of 41   Page ID
#:2213
Case 8:10-cv-01873-AG -MLG   Document 143-1   Filed 03/02/11   Page 35 of 41   Page ID
#:2162
Case 8:10-cv-01873-AG -MLG   Document 128   Filed 02/22/11   Page 34 of 40   Page ID
#:2010

1    into a market constrains anticompetitive conduct, irrespective of the market's degree of

2    concentration."), rev'd on other grounds, 495 U.S. 271 (1990); *see also U.S. v. Syufy Enters.*,

3    903 F.2d 659, 664-65 (9th Cir. 1990), aff'd, 903 F.2d 659 (9th Cir. 1990); *U.S. v. Waste Mgmt.,*

4    *Inc.*, 743 F.2d 976, 981-83 (2d Cir. 1984) (finding a 48.8% market share insufficient because of

5    easy entry).

6

7    159. If entry is not costly and can be accomplished quickly, entry barriers are generally found to

8    be low. *See, e.g., Baker Hughes*, 908 F.2d at 989 (noting that the sales and service network

9    required for entry is not costly); *Waste Mgmt.*, 743 F.2d at 982 (assets required for entry are

10   easily obtained); *U.S. v. Calmar Inc.*, 612 F. Supp. 1298, 1305-07 (D.N.J. 1985) (technology

11   required for entry is simple).

12

13   160. "In the absence of significant [entry] barriers, a company probably cannot maintain

14   supracompetitive pricing for any length of time." *Baker Hughes*, 908 F.2d at 987.

15

16   161. Defendants are not required to prove that entry will be "quick and effective" because

17   "[s]uch evidence is rarely available." *Id.*, 908 F.2d at 988.  Although defendants may present

18   actual examples of firms that are "poised for future expansion," such examples are not required

19   as "a firm that never enters a given market can nevertheless exert competitive pressure on that

20   market.  If barriers to entry are insignificant, the threat of entry can stimulate competition in a

21   concentrated market, regardless of whether entry ever occurs." *Id.* at 988-89; *see also Falstaff*

22   *Brewing*, 410 U.S. at 532-33; *Procter & Gamble.*, 386 U.S. at 581.

23

24   162. "[A]lthough significant, statistics concerning market share and concentration are 'not

25   conclusive indicators of anticompetitive effects.'" *Arch Coal*, 329 F. Supp. 2d at 130 (quoting

26   *Gen. Dynamics Corp.*, 415 U.S. at 498.  Indeed, "relying too heavily on a statistical case of

27   market concentration alone" is inappropriate, and "instead a broad analysis of the market to

28   determine any effects on competition is required." *Id.*

35

163. A merger or acquisition is likely to have unilateral effects if it will permit the combined firm to raise prices unilaterally post-merger. *Merger Guidelines* at § 6.1; *Oracle*, 331 F. Supp. 2d at 1113.

164. In evaluating the legality of a merger or acquisition under section 7, courts consider the procompetitive benefit of efficiencies related to the transaction. *Tenet Health Care Corp.*, 186 F.3d at 1054-55.

165. Mergers may enhance competition by combining complementary assets, eliminating duplicative assets, or achieving scale economies. *See, e.g., Cardinal Health*, 12 F. Supp. 2d at 63; *FTC v. Alliant Techsystems*, 808 F. Supp. 9, 21 (D.D.C. 1992); *U.S. v. Carilion Health Sys.*, 707 F. Supp. 840, 849 (W.D. Va. 1989), aff'd mem., 892 F.2d 1042 (4th Cir. 1989); *FTC v. Owens-Illinois, Inc.*, 681 F. Supp. 27, 53 (D.D.C. 1988), vacated as moot, 850 F.2d 694 (D.C. Cir. 1988). These efficiencies may directly benefit consumers by, for example, improving quality, increasing innovation, and lowering prices.

166. The Merger Guidelines recognize that "a primary benefit of mergers to the economy is their potential to generate significant efficiencies and thus enhance the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, enhanced service, or new products." *Merger Guidelines* § 10. "The Agencies will not challenge a merger if cognizable efficiencies are of a character and magnitude such that the merger is not likely to be anticompetitive in any relevant market." *Id.*

167. The Court cannot conclude at this time that the FTC has demonstrated likelihood of success on the merits. The FTC fails to establish its prima facie case. Even assuming a prima facie case, Defendants have presented sufficient rebuttal evidence, particularly about new entrants.

36

Case 8:10-cv-01873-AG -MLG Document 157-4 Filed 03/25/11 Page 37 of 41 Page ID #:2315
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 37 of 41 Page ID #:2164
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 36 of 40 Page ID #:2012

**3. BALANCING THE EQUITIES**

168. In addition to considering likelihood of success on the merits, the Court also weighs the equities. *FTC v. Affordable Media*, 179 F.3d 1228, 1233 (9th Cir. 1999).

169. "[T]he 'likelihood of success' analysis and the 'public equities' analysis are legally different points and the latter should be analyzed separately, no matter how strong the agency's case on the former." *See CCC Holdings*, 605 F. Supp. 2d at 75; *see also Elders Grain*, 868 F.2d at 903-04 (noting the impropriety of the district judge's collapse of the equities and merits inquiries into one inquiry).

170. The FTC must prove that "the harm to the parties and to the public that would flow from a preliminary injunction is outweighed by the harm to competition, if any, that would occur in the period between denial of a preliminary injunction and the final adjudication of the merits of the Section 7 claim." *FTC v. Occidental Petroleum Corp.*, No. 86-900, 1986 WL 952, at *12 (D.D.C. 1986) (quoting *FTC v. Great Lakes Chem. Corp.*, 528 F. Supp. 84, 86 (N.D. Ill. 1981)).

171. Indeed, in order to sustain its burden, the FTC must present evidence and make an actual showing that that the equities favor enjoining the transaction. *See, e.g.*, *Whole Foods*, 548 F.3d at 1049-50 (Tatel, J., concurring) (remanding to the District Court for the parties to provide evidence on the equities); *Arch Coal*, 329 F. Supp. 2d at 160 (finding that the evidence presented by the FTC on equities was insufficient); *FTC v. Illinois Cereal Mills, Inc.*, 691 F. Supp. 1131, 1140 (N.D. Ill. 1988) (The FTC "must show that the equities favor issuing the relief sought."); *Great Lakes*, 528 F. Supp. at 86-87("[T]he FTC must show that 'the equities' favor enjoining the transaction.").

172. Even if the Court finds that the FTC has demonstrated a likelihood of success on the merits, "particularly strong equities [that] favor the merging parties" will bar a preliminary injunction.

*37*

Case 8:10-cv-01873-AG-MLG Document 157-4 Filed 03/25/11 Page 38 of 41 Page ID #:2316
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 38 of 41 Page ID #:2165
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 37 of 40 Page ID #:2013

1 | *See Whole Foods*, 548 F.3d at 1035; *see also Great Lakes*, 528 F. Supp. at 87 ("Courts have
2 | recognized that public equities such as increased exports and benefits to local communities are
3 | 'important equities' that can lead to denial of preliminary relief even where the FTC shows the
4 | requisite likelihood of success.").

6 | 173. Conversely, "[a]bsent a likelihood of success on the merits, equities alone will not justify an
7 | injunction." *Arch Coal*, 329 F. Supp. 2d 109, 159.

9 | 174. A district court "may properly consider both public and private equities in undertaking the
10 | weighing mandated by Section 13(b)." *Freeman Hosp.*, 69 F.3d at 272 (quoting *FTC v. Nat'l*
11 | *Tea Co.*, 603 F.2d 694, 697 (8th Cir. 1979); *see also Warner Commc'ns*, 742 F.2d at1165 (ruling
12 | that private interests "are entitled to serious consideration").

14 | 175. "[P]ublic and private interests are not altogether distinct, since in many situations the public
15 | interest is merely the aggregation of private interests." *Elders Grain*, 868 F.2d at 904.

17 | 176. Public equities include improved quality, lower prices, increased efficiency, realization of
18 | economies of scale, consolidation of operations, and elimination of duplication. *Owens-Illinois*,
19 | 681 F. Supp. at 52; *see also Great Lakes*, 528 F. Supp. at 98 (noting that the public and private
20 | equities include benefits to shareholders, increased exports, improved R&D, preservation of
21 | local business, and alleviation of acquired company's poor financial condition).

23 | 177. "The principal public equity weighing in favor of issuance of preliminary injunctive relief
24 | is the public interest in effective enforcement of the antitrust laws." *Heinz*, 246 F.3d at 726
25 | (citing *Univ. Health*, 938 F.2d at 1225); *accord, Exxon*, 636 F.2d at 1343. Effective enforcement
26 | "is made difficult when the FTC must undo a merger after it has been consummated," *Freeman*
27 | *Hosp.*, 69 F.3d at 272, and the Court must take into account – as a "public equity" – the
28 | possibility that "denial of a preliminary injunction would preclude effective relief if the

*38*

Case 8:10-cv-01873-AG -MLG Document 157-4 Filed 03/25/11 Page 39 of 41 Page ID #:2217
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 39 of 41 Page ID #:2166
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 38 of 40 Page ID #:2014

1  Commission ultimately prevails and divestiture is ordered." *Warner Commc'ns*, 742 F.2d at

2  1165.

3

4  178. While courts can take account of any relevant "private equities," the "public equities

5  receive far greater weight" in the balancing analysis. "[T]he pecuniary interests of the defendants

6  should not be given controlling weight in deciding whether a preliminary injunction should be

7  issued." *Elders Grain*, 868 F.2d at 904. Thus, the Court may not "rank as a private equity

8  meriting weight a mere expectation of private gain from a transaction the FTC has shown is

9  likely to violate the antitrust laws." *Weyerhaeuser*, 665 F.2d at 1083.

10

11  179. Courts must also carefully consider whether preliminary injunctive relief is appropriate in

12  light of the long time period between preliminary proceedings and a final decision on the merits.

13  *Occidental*, 1986 WL 952, at *13 (Because of the "glacial pace of an FTC administrative

14  proceeding," the FTC's burden is a heavy one as "'[e]xperience seems to demonstrate that . . .

15  the grant of a temporary injunction in a Government antitrust suit is likely to spell the doom of

16  an agreed merger.'") (quotation omitted); *FTC v. Freeman Hosp.*, 911 F. Supp. at 1227 n. 8

17  (W.D. Mo. 1995) (denying preliminary injunction because the acquired company would no

18  longer be in business by the time the FTC determined the merits of the dispute given that the

19  "average time from the issuance of a complaint by the FTC to an initial decision by an

20  administrative law judge averaged nearly three years in 1988").

21

22  180. This is particularly true when the government is the plaintiff as the merging parties will not

23  be compensated for their harm during the pendency of the injunction, which renders such harm

24  irreparable. *See, e.g.*, *Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 770-71 (10th

25  Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as

26  sovereign immunity constitutes irreparable injury."); see also *United States v. FMC Corp.*, 218

27  F. Supp. 817, 823 (D.C. Cal. 1963) (denying preliminary injunction because "the benefits to be

28  lost by Avisco if the government is granted the relief which it seeks cannot be recouped should

*39*

Case 8:10-cv-01873-AG -MLG Document 157-4 Filed 03/25/11 Page 40 of 41 Page ID #:2218
Case 8:10-cv-01873-AG -MLG Document 143-1 Filed 03/02/11 Page 40 of 41 Page ID #:2167
Case 8:10-cv-01873-AG -MLG Document 128 Filed 02/22/11 Page 39 of 40 Page ID #:2015

1  defendants ultimately prevail").

2

3  181. Whether a company is financially distressed or failing is also an important equitable

4  consideration. *See, e.g., Freeman Hosp.*, 911 F. Supp. at 1227-28 (denying preliminary

5  injunction because hospital would "no longer be in business by the time the FTC gets around to

6  conducting a hearing on the merits of this dispute" despite the FTC's desire to avoid "having to

7  unscramble the eggs later"); *Great Lakes*, 528 F. Supp. at 87 ("[T]he debilitated condition of

8  Velsicol's bromine operations is an important equity to be considered because a preliminary

9  injunction would exacerbate Velsicol's problems . . . ."); *U.S. v. G. Heileman Brewing Co., Inc.*,

10 345 F. Supp. 117, 124 (E.D. Mich. 1972) (finding that the acquired company was "in such a

11 financially weakened condition that a preliminary injunction could . . . remove it as a

12 competitive economic unit [and that] interlocutory relief is, under these circumstances,

13 inequitable").

14

15 182. Because of courts' preferences for narrow rather than broad remedies, a preliminary

16 injunction is particularly inappropriate where divestiture is a viable remedy. *See Great Lakes*,

17 528 F. Supp. at 87 ("When weighing these equities, the court must consider whether divestiture

18 would be an adequate remedy if, in fact, the FTC eventually prevails on the merits, since the

19 purpose of Section 13(b) is to preserve the ability to 'order effective, ultimate relief,' not to bar

20 all mergers that the FTC staff preliminarily views as suspicious."); *Owens-Illinois*, 681 F. Supp.

21 at 54 ("[I]n determining to deny preliminary relief, this avenue of relief [divestiture] must also be

22 examined for later vindication of the public interest in the event the FTC ultimately is able to

23 prove its case.").

24

25 183. Courts have routinely permitted integration of certain assets where such integration would

26 preserve the potential for divestiture in the future. *See, e.g., U.S. v. WorldCom, Inc.*, No.

27 100-CV-02789 (RWR), 2001 WL 1057877, at *2 (D.D.C. Aug. 29, 2001) (modifying hold

28 separate "to improve the chances for accomplishing the divestiture"); *United States v. Newel*,

40

1  Inc., Civil No. N-82-305, 1985 WL 6262, at *3 (D. Conn. July 16, 1985) (modifying hold

2  separate order due to "irreparable losses"); *Occidental*, No. 86-900, 1986 WL 952, at *11-12

3  (D.D.C. April 29, 1986) (allowing acquisition where it would improve acquired assets making

4  divestiture easier); *Great Lakes*, 528 F. Supp. at 98 ("If the acquisition were permitted to go

5  forward and Great Lakes was ultimately required to divest [the acquired company], competition

6  would be improved, not lessened, because Great Lakes would be selling a more viable operation

7  than presently exists.").

8

9  184. The Court concludes that the balancing of the equities strongly favors Defendants.

10

11  **DISPOSITION**

12

13      Based on the applicable facts and law concerning the relevant markets and other issues,

14  the Court cannot conclude that the FTC is likely to succeed on the merits. Even if the FTC had

15  demonstrated likelihood of success on the merits, such likelihood is minimal and heavily

16  outweighed by the equities favoring denial of the injunction. Accordingly, the Court DENIES

17  the preliminary injunction. The temporary restraining order issued by the Court in this matter is

18  now dissolved.

19

20

21  IT IS SO ORDERED.

22

23  DATED: February 22, 2011

24

25

26                                    Andrew J. Guilford

27                                    United States District Judge

28

41