**DX 324**

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

| | | |
|---|---|---|
| **COMMISSIONERS:** | **Edith Ramirez, Chairwoman**<br>Maureen K. Ohlhausen<br>Terrell McSweeny | 1610020 |

| | |
|---|---|
| **In the Matter of**<br><br>　　Superior Plus Corp.<br>　　　　a corporation,<br><br>　　And<br><br>　　Canexus Corporation<br>　　　　a corporation. | **Docket No. 9371**<br><br>**PUBLIC VERSION** |

**COMPLAINT**

Pursuant to the provisions of the Federal Trade Commission Act ("FTC Act"), and by the virtue of the authority vested in it by the FTC Act, the Federal Trade Commission ("Commission"), having reason to believe that Respondents Superior Plus Corp. ("Superior") and Canexus Corporation ("Canexus") have executed an acquisition agreement in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, which if consummated would violate Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the FTC Act, and it appearing to the Commission that a proceeding by it in respect thereof would be in the public interest, hereby issues its complaint pursuant to Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), and Section 11(b) of the Clayton Act, 15 U.S.C. § 21(b), stating its charges as follows:

### I. NATURE OF THE CASE

1. Superior's proposed acquisition of Canexus (the "Acquisition") would combine two of the three major producers of sodium chlorate in North America. Sodium chlorate is a commodity chemical whose primary use is for bleaching wood pulp for paper, tissues, and other products. Superior and Canexus account for more than 50 percent of the sodium chlorate production capacity in North America.

2. In Superior's own words, the North American sodium chlorate market is an "oligopoly" that is "dominated by a small number of players." Absent injunctive relief, two firms, Superior and AkzoNobel ("Akzo"), will control approximately 80 percent of North American sodium chlorate capacity, resulting in post-Acquisition market shares that easily exceed the market concentration levels presumed likely to result in anticompetitive effects under the Federal Trade Commission and U.S. Department of Justice Horizontal Merger Guidelines ("Merger Guidelines") and under the relevant case law.

1

3. The Acquisition would substantially lessen competition in the market for sodium chlorate. First, by placing more than 50 percent of all production capacity into the hands of Superior—a company long focused on careful capacity management as a means of maintaining profitability—the Acquisition would increase the likelihood of future anticompetitive output reductions to increase price. Second, by consolidating more than 80 percent of total production capacity in the hands of the two most disciplined producers, and by removing Canexus, a uniquely disruptive, low-cost competitor, the Acquisition would increase the likelihood of coordination in an already vulnerable market.

4. New entry or expansion by existing producers would not be timely, likely, or sufficient to counteract the anticompetitive effects of the acquisition. Superior noted in an internal business presentation that "barriers to entry are high." Likewise, Canexus observed that barriers to entry are "significant" and that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Constructing a new sodium chlorate manufacturing facility is expensive and time-consuming, making entry unlikely in this market characterized by declining demand. The newest sodium chlorate facility in North America opened in 2002. Similarly, expansion by the remaining firms sufficient to offset the Acquisition's anticompetitive effects is unlikely. Since 2005, the sodium chlorate industry has removed capacity, not added it.

5. Respondents cannot show cognizable efficiencies that would offset the likely and substantial competitive harm from the Acquisition.

## II.     JURISDICTION

6. Respondents are, and at all relevant times have been, engaged in commerce or in activities affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

7. The Acquisition constitutes an acquisition subject to Section 7 of the Clayton Act, 15 U.S.C. § 18.

## III.    RESPONDENTS

8. Superior is a publicly traded company based in Toronto, Ontario. It divides its business into three operating segments: (1) Specialty Chemicals, sold under the ERCO brand name; (2) Energy Services; and (3) Construction Products Distribution. In 2014, Superior had C$3.976 billion in global sales. The ERCO business, which manufactures and sells sodium chlorate and chlor-alkali chemicals, generated C$652 million in revenue in 2014, with the North American sodium chlorate business generating C$382 million in revenue. Superior owns six sodium chlorate plants in North America: five in Canada, and one in the United States.

9. Canexus is a publicly traded chemical company based in Calgary, Alberta. It reported total 2014 revenue of C$539 million, with sodium chlorate accounting for revenue of C$233 million. Canexus operates three sodium chlorate plants in Canada. Its Brandon, Manitoba facility is by far the largest and the lowest-cost sodium chlorate plant in North America.

### IV.   THE ACQUISITION

10. Under an agreement dated October 5, 2015 ("Acquisition Agreement"), Superior proposes to acquire all of the outstanding shares of Canexus in a transaction valued at $982 million, including the assumption of $618 million in debt.

### V.   BACKGROUND

#### A. Sodium Chlorate

11. Sodium chlorate is a commodity chemical, manufactured by running electric current through purified salt water. It can be produced in either crystal or solution form. The vast majority of sodium chlorate sold in North America is in crystal form.

12. Sodium chlorate is widely used as a key process-chemical for bleaching wood pulp, which accounts for more than 90 percent of North American chlorate consumption. Pulp mills perform on-site conversion of sodium chlorate into chlorine dioxide — the actual bleaching agent. Because chlorine dioxide is volatile and expensive to ship and handle, most mills must produce it on-site. In turn, bleached pulp is the foundation of a variety of paper products, including coated sheet paper, tissues, and diaper liners.

13. Producers mainly ship sodium chlorate crystal by rail or truck, though a few customers located adjacent to sodium chlorate plants can also receive the solution form by pipeline. Industry practice is for producers to quote delivered prices. The largest cost components of sodium chlorate are electricity, which accounts for approximately 70-80 percent of production costs, salt, and freight.

#### B. Market Participants and Industry Dynamics

14. Over the past decade, the North American sodium chlorate industry has experienced declining demand and capacity rationalization because of lower demand for paper products.

15. Because pulp and paper manufacturing is the primary end use for sodium chlorate, the decline in demand for paper in the digital age has caused a corresponding decline in demand for sodium chlorate. As Superior explained in an internal business document, sodium chlorate producers have responded to declining demand by removing capacity from the market and increasing exports in order to protect prices and producer profits:

> [T]he market has adjusted to demand reduction with supply side management. Production capacity has been removed from the market as demand decreased. Additionally an increasing amount of sodium chlorate is being exported from North America to the extent that ▮ of the North American production is now exported. ... Despite the declining market, producers have consistently achieved growing and stable profit margins ...

16. As Superior's own documents state, the sodium chlorate market is an "oligopoly" with three "dominant market players": Superior, Canexus, and Akzo. The two smaller players — Kemira and Chemtrade — have much less capacity and a limited effect on competition.

17. Although 70 percent of North American production capacity is located in Canada, U.S. customers account for roughly 75 percent of North American chlorate sales. There is no production capacity or meaningful consumption of sodium chlorate in Mexico.

18. Superior operates five sodium chlorate plants in Canada (Buckingham, Quebec; Vancouver, British Columbia; Grand Prairie, Alberta; Hargrave, Manitoba; and Saskatoon, Saskatchewan) and one in the U.S. (Valdosta, Georgia), with an overall capacity of ▮ metric tons. In addition to the North American sales from these facilities, Superior exports approximately ▮ percent of its total annual production to Europe, Asia, and South America. Since 2006, Superior has closed chlorate plants in Bruderheim, Alberta, and Thunder Bay, Ontario, and contributed to the closure of former competitor Tronox's plant in Hamilton, Mississippi.

19. Canexus operates three plants in Canada (Brandon, Manitoba; Beauharnois, Quebec; and Nanaimo, British Columbia), with an overall capacity of ▮ metric tons. At a production capacity of ▮ metric tons, Canexus's Brandon plant is by far the largest, lowest-cost plant in North America. Brandon's position as the lowest-cost production facility in North America is the result of its operating in Manitoba, the lowest-cost electricity jurisdiction in North America, and of its significant economies of scale. Canexus ships from Brandon to customers throughout North America. Its two other plants are smaller and higher cost. Canexus exports some sodium chlorate ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Since 2007, Canexus has closed chlorate plants at Amherstburg, Ontario, and Bruderheim, Alberta.

20. Akzo, under the brand name Eka, operates two sodium chlorate plants in Canada (Magog, Quebec and Valleyfield, Quebec) and two in the U.S. (Columbus, Mississippi and Moses Lake, Washington), with an overall practical capacity of ▮ metric tons. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4

21. Kemira is the bigger of the two smallest competitors. It operates two plants in the southeast U.S. (Augusta, Georgia and Eastover, South Carolina), with an overall capacity of ▆▆▆ metric tons. ▆▆▆

22. Chemtrade has a single sodium chlorate plant in western Canada (Prince George, British Columbia), with a practical capacity of ▆▆▆ metric tons. ▆▆▆

23. In 2013, Superior entered into an agreement with sodium chlorate producer Tronox, whose only North American sodium chlorate facility was in Hamilton, Mississippi. Under the agreement, Superior paid Tronox for the exclusive right to purchase all of Tronox's sodium chlorate production and customer contracts. Therefore, from 2013-2015, Superior was the exclusive seller of sodium chlorate produced by Tronox. Superior's goal, stated both internally and to investors, was to use the agreement it entered with Tronox to "help reduce [the] North American supply" of sodium chlorate in order to make the market "more conducive to price increase[s]." Last year, Superior announced that it was electing to purchase no volume from Tronox in 2016, meaning that Superior is paying Tronox about ▆▆▆ million to produce no sodium chlorate. Tronox responded by closing its facility and exiting the market at the end of 2015, with Superior assisting Tronox in decommissioning the plant.

## VI. RELEVANT PRODUCT MARKET

24. The relevant product market in which to analyze the Acquisition's effects is the manufacture and sale of sodium chlorate. Superior describes sodium chlorate as "the technology of choice for pulp bleaching." Customers (paper mills) have no viable substitute for sodium chlorate in the bleaching process, and could not realistically switch to other products in the face of a small but significant and non-transitory increase in price ("SSNIP") for sodium chlorate.

25. Other products do not constrain the price of sodium chlorate. Customers play sodium chlorate producers against each other to obtain lower pricing and better contractual terms. Superior's outgoing vice president of its sodium chlorate business testified that customers rarely threaten to switch away from sodium chlorate when facing a price increase, and that never in his memory had Superior actually lowered its price or offered better terms to any customer in direct response to a threat to substitute another chemical or processes for sodium chlorate. Customers also state that they do not threaten to switch to alternative products or processes.

26. Respondents themselves recognize that other products are not meaningful substitutes for sodium chlorate. Canexus's business documents stated that demand for sodium chlorate is "fairly price inelastic" and that there are "no economically viable substitutes" for sodium chlorate in the pulp bleaching process. Superior similarly stated in its internal business documents that "demand is inelastic."

## VII.   RELEVANT GEOGRAPHIC MARKET

27. The relevant geographic market in which to assess the Acquisition is North America. Customers in the U.S. account for roughly 75 percent of all North American chlorate sales, and receive product from plants throughout both the U.S. and Canada. North American freight costs are low, typically accounting for approximately 10 percent of the delivered price, which allows North American plants to profitably ship to customers throughout the continent.

28. While some North American chlorate producers export sodium chlorate outside of the North American market, almost no sodium chlorate is imported. Customers report that imports are prohibitively expensive and complicated by special handling requirements — limiting their realistic sourcing options to North American producers.

29. Respondents operate their plants as part of an integrated North American supply network, optimizing supply across multiple plants and customers. Customers' supply contracts are not tied to specific plants. Although there is substantial variability in pricing across customers, there are no persistent regional pricing patterns. Consistent with this, the Respondents' internal business documents consistently refer to a "North American" sodium chlorate market.

30. Indeed, documentary evidence and testimony make clear that industry participants develop strategies, take actions, and understand pricing dynamics to operate at the North American level. For example, an internal Superior presentation discussed "North American Sodium Chlorate Supply and Demand," and noted that "[e]xports are critical to maintaining North American balance." On a Superior earnings call, Superior's CEO explained why it was choosing not to sell any more Tronox chlorate: "The potential to remove 130,000 ton of sodium chlorate supply from the North American market would largely balance the North American supply and demand fundamentals, which should provide Superior an improved opportunity to recover production costs." Likewise, in describing its competitive position, Canexus stated, "The North American sodium chlorate market is efficient and favors low cost producers … [C]ost curve positioning is paramount, as low cost plants compete most effectively on a delivered cost basis across North America." Canexus' Vice President of Sales and Marketing testified under oath that Canexus "look[s] at the market more in a continental basis, than a regional basis."

## VIII.   MARKET CONCENTRATION AND THE ACQUISITION'S PRESUMPTIVE ILLEGALITY

31.   Post-acquisition, the sodium chlorate market in North America would be highly concentrated, with Superior alone accounting for more than 50 percent of market share by any measure (i.e., capacity, sales volume, or sales revenue), and two firms, Superior and Akzo, controlling more than 80 percent of the market.

32.   The Merger Guidelines and courts measure concentration using the Herfindahl-Hirschman Index ("HHI").  The HHI is calculated by totaling the squares of the market shares of each firm in the relevant market.  Under the Merger Guidelines, a merger is presumed likely to create or enhance market power—and is presumptively illegal—when the post-merger HHI exceeds 2,500 and the merger increases the HHI by more than 200 points.

33.   Because sodium chlorate is a homogenous, commodity chemical product, relative production capacities are the best measure of market shares.  Whether measured by production capacity, production volume, or sales revenue, however, Superior's acquisition of Canexus would result in a post-merger HHI exceeding 3,800, with an increase in the HHI of more than 1,300.  Thus, by any measurement, the acquisition would result in concentration well above the amount necessary to establish a presumption of competitive harm.

34.   The acquisition is presumptively unlawful under relevant case law and the Merger Guidelines.

## IX.   THE ACQUISITION WOULD INCREASE SUPERIOR'S INCENTIVE AND ABILITY TO CURTAIL OUTPUT

35.   The Acquisition is likely to cause output curtailment.  In Superior's own words, "[i]n an Oligopoly, Supply Side management is the key to maintaining profitability."  Canexus identifies "excess capacity which is impeding pricing appreciation for producers" ████ ████████████████████████████████  Allowing Superior to acquire Canexus would increase Superior's incentive and ability to decrease output, thus leading to higher prices.

36.   Respondents' documents make clear the relationship between available sodium chlorate capacity and prices:  when competitors have underutilized capacity, competition intensifies and prices either stagnate or fall, but when supply becomes tight, competition softens and prices increase.  For example, in 2013, Superior's CEO informed investors that a "small supply demand [im]balance in chlorate has resulted in negative overall pressure on selling prices."  Similarly, in an internal planning document Canexus observed that "[t]he North American chlorate industry requires higher operating rates █ █████ in order to achieve upward pricing momentum."  Given this correlation, Respondents closely monitor North American industry capacity utilization.

37. Superior has a history of attempting to use output curtailment as a means to support higher prices. These efforts include reducing production, increasing exports from North America, closing sodium chlorate production facilities, and shutting down production lines.

38. Curtailing output at a sodium chlorate plant can be accomplished simply by turning down a dial that controls electric current. Individual lines and entire plants can be shut down for periods as short as only a few hours at a time. Superior's documents show that Superior has curtailed output at its plants to support higher pricing. For instance, in May 2013 the President of Superior's ERCO business wrote in an internal email, "the market is declining and if we do not take steps to restructure the supply side, the result will be reduced volume or price," and that Superior felt that "reduced volume to maintain pricing is the prudent path to take." In February 2015, Superior's CEO explained that given the "race to the bottom" pricing by some of its competitors, Superior was reducing capacity in 2015 and intended to "continue on that pace into the 2016 years and on."

39. Increasing exports can also serve as a means of limiting supply to North American customers. Superior views exports as "critical" to maintaining a balanced market in North America, and uses exports as additional means of supporting pricing in North America. For example, Superior observed in internal documents that it ▮▮▮ "have always used exports as a means to maintain an equilibrium in the market" and that its pricing has benefited from "tightening supply caused by greater exports and curtailed production." Canexus, on the other hand, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

40. Since 2005, Superior, Canexus, and Akzo each has permanently removed capacity from the market. The smaller producers, Kemira and Chemtrade, have not followed suit, but as Superior recognized in an internal presentation, these smaller players "cannot curtail without exiting the business."

41. When Superior has removed capacity from the market, it has done so with the clear expectation that prices will increase as a result. For example, in a board proposal, Superior stated that its 2005 announcement that it was closing its Thunder Bay facility would "prepare the market in advance for [a] planned, very significant, sodium chlorate price increase announcement" and that the reduction in capacity would "permit the increase of prices in the range of $50 per [metric ton]."

42. Superior's most recent initiative to reduce North American capacity was its purchase agreement with sodium chlorate producer Tronox. That agreement culminated in Superior electing to purchase no volume from Tronox in 2016 (and paying Tronox ▮▮ million not to produce any sodium chlorate), and assisting Tronox with decommissioning its plant at the end of 2015. Superior made clear that a purpose of the Tronox agreement was to allow Superior to manage North American chlorate supply in order to support higher prices. An internal Superior document dating from the inception of the Tronox agreement in 2013 stated that, "[t]hrough management of the Tronox arrangement, [Superior] will bring the Sodium Chlorate market back into equilibrium, improving

8

earnings through its pricing impact." Superior's senior executives likewise informed investors of its intention to reduce volumes under the Tronox agreement in order to "reduce North American supply" of sodium chlorate so that "the market should be more conducive to price increase[s]." Ultimately, Superior elected not to buy any volume from Tronox in 2016 in expectation that this would lead the Tronox facility to close, thereby increasing industry capacity utilization and positioning the company for price increases. Superior went so far as to inform investors that it expected price increases to occur in 2016 as a result of Tronox's exit. Contemporaneous ▬▬▬ Canexus business documents ▬▬▬

43. Allowing Superior, which is already focused on managing its capacity in light of overall market-wide capacity, to acquire one of the other two large chlorate producers would increase the likelihood of future output reductions. Consistent with Merger Guidelines § 6.3, this merger of homogenous-good producers is likely to incentivize the merged entity to engage in unilateral output curtailment because:

- the merged firm would have a high market share (more than 50 percent by any measure);

- the merged firm would have relatively little output already committed at fixed pricing (many contracts open each year and many allow for price escalations);

- the margin on curtailed output would be relatively low (the merged entity would have a portfolio that would include several of the higher-cost plants in the market);

- the supply responses of rivals would be relatively small (capacity constraints quickly bind competitors, and entry and/or expansion is slow, expensive, and unlikely); and

- the market elasticity of demand is relatively low (the Respondents themselves assume demand to be price-inelastic).

44. Consistent with this, Superior's documents indicate a desire to curtail output post-Acquisition. As early as 2009, when Superior first contemplated a possible merger with Canexus, it listed among the benefits of the merger that "[s]ome of the smaller plants could be rationalized." In 2014, an internal email among Superior management explained that "[t]he picture we painted on the chlorate market has [our CEO] thinking about the Canexus merger and ▬▬▬ high cost plants." In the fall of 2014, Superior's CEO told the Chairman of Canexus's Board that he viewed a merger with Canexus as a means of ▬▬▬ rationalization in the market.

### X.    THE ACQUISITION WOULD INCREASE THE LIKELIHOOD OF ANTICOMPETITIVE COORDINATION

45. The sodium chlorate market has a number of characteristics that make it vulnerable to coordination, including significant transparency into competitive activities, opportunities for communication between competitors, and strong interdependence among competitors.

9

Allowing Superior to acquire Canexus would make anticompetitive coordination more likely going forward by eliminating a large, low-cost, uniquely disruptive competitor. Post-Acquisition, the only remaining major suppliers of sodium chlorate would be Superior and Akzo, ███████████████████████████████████████ ███████████████████.

46. Sodium chlorate is a homogenous product with a market characterized by declining demand, stable market shares, and high barriers to entry. In addition, suppliers have considerable transparency into the businesses of their competitors. Competitors track a wealth of information about each other, including ███████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████. Competitively sensitive information is accessible to competitors through published price increase announcements and public statements such as earnings calls. Competitors also obtain competitively sensitive information from a variety of other sources, including ██████████████████████████████████████████████████████.

47. In addition to significant market transparency, competitors have ample opportunities to communicate with each other, including discussions at trade association meetings, conversations about product swaps, and █████████████████████████████████ ██████████. Internal documents show that Superior executives have at least contemplated ████████████████████████████████████████████████████. In May 2015, upon receiving a copy of a Superior price increase letter that was ready to be sent out, Superior's CEO emailed the president of chemical sales, ████████████ ████████████████████████████████████████████████████████████████████ ███████████ In June 2014, Superior's president of chemical sales emailed its CEO, ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████.

48. Sodium chlorate producers also use █████ consulting firm ████████████ ████████████████████████████████████████████████████████████████. In July 2015, Superior's head of chlorate sales asked ██████████████ for information about a possible ████ price increase. ████████████ responded by providing the specific amount of ██████████████████████ price increases, ██████████████ ████████████████████████. In the same email exchange, ████████ asked Superior's head of chlorate sales to provide information about the average price increase Superior had achieved on its formula-based accounts, and he responded that they should talk via phone. ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████. Despite confirming that at least some of the pricing information received ████████ was not public, Superior's management included the information in a report circulated to its Board of Directors.

49. The three major players recognize their mutual interdependence and aligned incentives today. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Respondents' ordinary course documents reflect a desire to support competitors' efforts to raise prices, and show that Respondents give careful consideration to how their potential bids might disrupt market stability. For instance, in internal emails, Canexus executives express concern about inciting "price wars" with competitors. Superior's internal documents are blunt about the speed and certainty with which producers respond to each other's actions, observing that "[t]he market is dominated by a small number of players . . . the actions of any one firm will affect overall market conditions and spur[s] an immediate response by other competitors."

50. Removing Canexus from a market that is already vulnerable to coordination would make coordination more likely going forward. Despite its concerns about creating market instability, Canexus's large, low-cost Brandon facility has enabled it to be a frequently aggressive competitor who is uniquely able to disrupt potential coordination:

- In 2014, 

- In 2014, 

- In 2015, 

- In 2015, Superior attempted a price increase at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, but eventually agreed to delay the price increase because Canexus ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- In 2015, ████████████████████████████████████████████

- For 2016, ████████████████████████████████████████████

51. Contemporaneous business documents from chlorate suppliers reflect the importance of Canexus as an independent competitor. In its own business documents, Canexus observed that it has the "[s]trongest competitive positioning in North America due to Brandon" and that it "can compete on price with any other producer in North America and remain highly profitable." Superior ████████ describe Canexus as aggressive and a constraint on pricing, ████████████████████████████████████████

52. In the period leading up to the announcement of the proposed Acquisition, Superior documents reflect a growing frustration and concern about the ability of Canexus to disrupt sales patterns and undermine price increases:

- In July 2013, the President of Superior's ERCO business complained about Canexus trying to steal Superior accounts: "We have seen [Canexus] very aggressively trying to renew [our] contracts coming open at year end with lower pricing."

- In July 2014, the President of Superior's ERCO business told the President of Superior, "My long term worry is that [Canexus] will significantly expand Brandon … [That] could destroy the chlorate business model."

- In a September 2014 email to fellow Board members, Superior's CEO wrote, "Canexus pricing of chlorate has been ████ lower than ours. We have announced price increases and they did not follow. Canexus should be gaining on margins since they are not [hedged] instead of making the extra margins they are selling at lower prices. They are really out of touch with the market. They are price takers instead of being marketers."

- The next week, a senior executive at Superior lamented that Canexus was "disruptive in the market" noting that Canexus was "dropping prices for volume." Superior's CEO echoed these sentiments in an October 2014 earnings call when he told investors that the competition (Canexus) "just wants to fill up their plant and are not really looking at pricing properly to maximize their opportunity." On the same earnings call, Superior's CFO noted that Canexus was "being very, very aggressive" which was "causing pressure on some of the pricing in chlorate."

12

- Subsequently, in November 2014, the president of Superior's ERCO business expressed further frustration with Canexus' disruptive approach to Superior's CEO, noting "I can't believe Canexus is being so aggressive […] ERCO raises the price only to have Canexus come in and mess things up."

- In May 2015, while anticipating making price increase announcements for the second half of 2015 and 2016, Superior's CEO considered holding off making such announcements as he "wonder[ed] if Canexus will be more aggressive if so we should wait to see what they will do."

53. Testimony from Superior's CEO given under oath underscores the impact that Canexus has in the market. Superior's CEO testified that Canexus' lower pricing, failure to follow price increases, and passing foreign exchange gains through to customers all prevent Superior from raising chlorate prices to its customers.

54. By the summer of 2015, Superior's concern about Canexus's unique disruptive potential motivated it to pursue the present Acquisition. At that time, Superior's CEO fretted in an email that Canexus was "reducing prices looks like they have no sense of the Business." In response, Superior's Treasurer suggested that it might make sense to pursue an acquisition of Canexus "if they are going to continue to be so irrational." By July, Superior was in negotiations to acquire Canexus.

55. Post-Acquisition, Superior's remaining competitors would be unlikely to replicate Canexus's uniquely disruptive role in the market.  Once they do so, they can no longer compete for additional sales opportunities, and therefore can no longer act as constraints on pricing. Superior itself recognizes this reality, with a Superior executive observing in an internal email that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

56. Akzo has ▇▇▇▇▇▇▇▇▇▇, but Superior and Canexus describe the company as ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. In 2003, Akzo requested immunity from the European Commission for violations of European competition laws for attempting to raise sodium chlorate prices by setting target prices, allocating customer volumes, and exchanging information with European sodium chlorate competitors.

## XI. LACK OF COUNTERVAILING FACTORS

### A. Barriers to Entry and Expansion

57. Respondents cannot demonstrate that new entry or expansion by existing firms would be timely, likely, or sufficient to offset the anticompetitive effects of the Acquisition.

58. As Superior recognizes in its own business documents, there are high barriers to entry in the sodium chlorate market. Building a new sodium chlorate plant would take multiple years and a large capital investment that Canexus estimates would exceed ▮▮▮▮▮▮. Entry is unlikely given the ongoing decline in demand for sodium chlorate. Over the past ten years, multiple sodium chlorate plants have closed, but no new plants have been built. Expansion by the remaining firms post-Acquisition that would defeat anticompetitive effects is unlikely.

### B. Efficiencies

59. Respondents cannot demonstrate cognizable efficiencies that would be sufficient to rebut the strong presumption and evidence that the Acquisition likely would substantially lessen competition in the North American market for sodium chlorate.

## XII. VIOLATION

### Count I – Illegal Agreement

60. The allegations of Paragraphs 1 through 59 above are incorporated by reference as though fully set forth.

61. The Acquisition Agreement constitutes an unfair method of competition in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

### Count II—Illegal Acquisition

62. The allegations of Paragraphs 1 through 59 above are incorporated by reference as though fully set forth.

63. The Acquisition, if consummated, may substantially lessen competition in the relevant market in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and is an unfair method of competition in violation of Section 5 of the FTC Act, as amended, 15 U.S.C. § 45.

**NOTICE**

Notice is hereby given to the Respondents that the twenty-ninth day of November, 2016, at 10 a.m., is hereby fixed as the time, and the Federal Trade Commission offices at 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580, as the place, when and where an evidentiary hearing will be had before an Administrative Law Judge of the Federal Trade Commission, on the charges set forth in this complaint, at which time and place you will have the right under the Federal Trade Commission Act and the Clayton Act to appear and show cause why an order should not be entered requiring you to cease and desist from the violations of law charged in the complaint.

You are notified that the opportunity is afforded you to file with the Commission an answer to this complaint on or before the fourteenth (14th) day after service of it upon you.  An answer in which the allegations of the complaint are contested shall contain a concise statement of the facts constituting each ground of defense; and specific admission, denial, or explanation of each fact alleged in the complaint or, if you are without knowledge thereof, a statement to that effect.  Allegations of the complaint not thus answered shall be deemed to have been admitted. If you elect not to contest the allegations of fact set forth in the complaint, the answer shall consist of a statement that you admit all of the material facts to be true.  Such an answer shall constitute a waiver of hearings as to the facts alleged in the complaint and, together with the complaint, will provide a record basis on which the Commission shall issue a final decision containing appropriate findings and conclusions and a final order disposing of the proceeding.  In such answer, you may, however, reserve the right to submit proposed findings and conclusions under Rule 3.46 of the Commission's Rules of Practice for Adjudicative Proceedings.

Failure to file an answer within the time above provided shall be deemed to constitute a waiver of your right to appear and to contest the allegations of the complaint and shall authorize the Commission, without further notice to you, to find the facts to be as alleged in the complaint and to enter a final decision containing appropriate findings and conclusions, and a final order disposing of the proceeding.

The Administrative Law Judge shall hold a prehearing scheduling conference not later than ten (10) days after the Respondents file their answers.  Unless otherwise directed by the Administrative Law Judge, the scheduling conference and further proceedings will take place at the Federal Trade Commission, 600 Pennsylvania Avenue, N.W., Room 532, Washington, D.C. 20580.  Rule 3.21(a) requires a meeting of the parties' counsel as early as practicable before the pre-hearing scheduling conference (but in any event no later than five (5) days after the Respondents file their answers).  Rule 3.31(b) obligates counsel for each party, within five (5) days of receiving the Respondents' answers, to make certain initial disclosures without awaiting a discovery request.

## NOTICE OF CONTEMPLATED RELIEF

Should the Commission conclude from the record developed in any adjudicative proceedings in this matter that the Merger challenged in this proceeding violates Section 5 of the Federal Trade Commission Act, as amended, and/or Section 7 of the Clayton Act, as amended, the Commission may order such relief against Respondents as is supported by the record and is necessary and appropriate, including, but not limited to:

1. If the Acquisition is consummated, divestiture or reconstitution of all associated and necessary assets, in a manner that restores two or more distinct and separate, viable and independent businesses in the relevant market, with the ability to offer such products and services as Superior and Canexus were offering and planning to offer prior to the Acquisition.

2. A prohibition against any transaction between Superior and Canexus that combines their businesses in the relevant market, except as may be approved by the Commission.

3. A requirement that, for a period of time, Superior and Canexus provide prior notice to the Commission of acquisitions, mergers, consolidations, or any other combinations of their businesses in the relevant market with any other company operating in the relevant markets.

4. A requirement to file periodic compliance reports with the Commission.

5. Any other relief appropriate to correct or remedy the anticompetitive effects of the transaction or to restore Canexus as a viable, independent competitor in the relevant market.

**IN WITNESS WHEREOF**, the Federal Trade Commission has caused this complaint to be signed by its Secretary and its official seal to be hereto affixed, at Washington, D.C., this twenty-seventh day of June, 2016.

By the Commission.

Donald S. Clark
Secretary

SEAL: